## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## NORFOLK DIVISION

| | | |
|---|---|---|
| DANIEL KHOSHABA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Case No.** 2:24cv237 |
| | ) | |
| JOSEPH D. STILWELL; E.J. BORRACK; | ) | |
| KERRY G. CAMPBELL; PAULA J. | ) | |
| POSKON; MEGAN PARISI; STEFANI D. | ) | |
| CARTER; SAVERIO M. FLEMMA; | ) | **DERIVATIVE AND CLASS** |
| MICHELLE D. BERGMAN; DENNIS | ) | **ACTION COMPLAINT** |
| POLLACK; M. ANDREW FRANKLIN; | ) | |
| STILWELL VALUE PARTNERS VII, L.P.; | ) | |
| STILWELL ACTIVIST FUND, L.P.; | ) | |
| STILWELL ACTIVIST INVESTMENTS, | ) | **JURY TRIAL DEMANDED** |
| L.P.; STILWELL ASSOCIATES, L.P.; and | ) | |
| STILWELL VALUE LLC, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| WHEELER REAL ESTATE INVESTMENT | ) | |
| TRUST, INC., | ) | |
| | ) | |
| Nominal Defendant. | ) | |

Plaintiff Daniel Khoshaba ("Khoshaba" or "Plaintiff"), derivatively on behalf of Wheeler

Real Estate Investment Trust, Inc. ("Wheeler" or the "Company") and directly on behalf of himself

and a class of common stockholders of Wheeler, by and through his undersigned counsel, bring

this complaint against current and former members of the Company's Board of Directors (the

"Board"), including Joseph D. Stilwell ("Stilwell"), E.J. Borrack ("Borrack"); Kerry G. Campbell

("Campbell"), Paula J. Poskon ("Poskon"), Megan Parisi ("Parisi"), Stefani D. Carter ("Carter");

Saverio M. Flemma ("Flemma"), Michelle D. Bergman ("Bergman"), and Dennis Pollack ("Pollack"); the Company's Chief Executive Officer ("CEO"), M. Andrew Franklin ("Franklin" and, together with the named Board members, the "Individual Defendants"); and various funds controlled and managed by Stilwell that invested in Wheeler, including Stilwell Value Partners VII, L.P., Stilwell Activist Fund, L.P., Stilwell Activist Investments, L.P., Stilwell Associates, L.P., and Stilwell Value LLC (collectively, the "Stilwell Fund Defendants," and, together with the Individual Defendants, "Defendants"). The allegations herein are based upon Plaintiff's personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations.

## NATURE OF THE ACTION

1.      This is a shareholder derivative and direct class action brought by Plaintiff individually and on behalf of Wheeler and a class ("Class") comprised of all holders of Wheeler common stock who did not participate in the Company's July 2021 rights offering, through which Plaintiff challenges several self-interested and bad-faith decisions by members of the Company's Board and management to take advantage of that rights offering to enrich themselves and their fellow insiders, increase their percentage ownership in the Company, and—for Stilwell—establish effective majority control over the Company, to the detriment of the Company and all Class members, whose ownership and voting power have been severely diluted by these actions.

2.      On July 21, 2021, the Company offered all of its common stockholders the rights to purchase $30 million aggregate principal amount of senior subordinated convertible notes ("Notes") on a pro-rata basis, with each common stockholder receiving one right (affording each the ability to purchase $25 principal amount of Notes) for every eight shares of common stock owned (the "Rights Offering"). The Notes would bear interest at a rate of 7 percent annually, with interest payable each June 30 and December 31, commencing on December 31, 2021. The interest

would be payable at the Company's election in shares of Series B Preferred Stock (at a 45 percent discount to market value), Series D Preferred Stock (at the same 45 percent discount), or cash.

3.      At the time of the Rights Offering, the Company was facing a looming crisis with respect to its Series D Preferred Stock—as of September 21, 2023 (the "Redemption Date"), Series D shareholders would have the option to force the Company to redeem their shares at a redemption price of $25 per share, plus an amount equal to all accrued and unpaid dividends, in either cash or common stock (at the holder's election).  Assuming all of the Series D shareholders elected to redeem their preferred shares, the Company would be forced to pay tens of millions of dollars in cash or issue the equivalent in common stock, thus severely diluting—or even wiping out— existing common stockholders.  Redemption in common stock could also radically alter the power structure of the Company, as Series D Preferred Stock typically did not carry voting rights, but large Series D shareholders who converted those shares to common stock could substantially increase their control.  As Stilwell himself recognized prior to his appointment to the Board, it was imperative that the Board and management prevent such an apocalyptic redemption scenario by reaching an agreement with Series D shareholders to buy back all or much of the Series D Preferred Stock before the Redemption Date.  Indeed, the primary stated purpose of the Rights Offering was "to use the net proceeds . . . for . . . repurchases of our Series D Preferred Stock."

4.      In clear recognition of the negative impact the redemption of Series D shares would have on the value of the Company's common stock, the conversion rate for the Notes—which was ordinarily $6.25 per share of common stock (four shares for each converted Note)—would be drastically discounted if, after the Redemption Date, the Company were required to redeem more than 100,000 shares of Series D Preferred Stock to the lower of a (i) 45 percent discount to the original conversion price or (ii) 45 percent discount to the lowest price at which any holder of

Series D shares converted those shares into common stock.  Accordingly, the Rights Offering increased the (already significant) urgency to buy back a material amount, if not all, of the outstanding Series D shares before the Redemption Date, as failure to do so would result in a catastrophically dilutive event wherein both Series D shares and Notes would become convertible to common stock at what would be bargain-basement rates.

5.      Defendants, however, controlled the Board and management and viewed the Rights Offering as an opportunity to take a very different—and destructive—approach.  Led by Stilwell and the Stilwell Fund Defendants, these insiders purchased nearly all of the Notes offered in the Rights Offering and, from that point forward, did not seriously pursue a repurchasing of the Series D shares before the Redemption Date.  Instead, they made only pro forma tender offers to Series D stockholders that they knew would not be accepted, virtually guaranteeing that they could take advantage of the discounted conversion rate from Notes to common stock following the Redemption Date.  To make matters worse, they determined to pay the interest due on their Notes in deeply discounted Series D Preferred Stock on three different occasions prior to, and following, the Redemption Date, when they knew that those Series D shares could soon (or immediately) be converted to nearly double the value in either common stock or cash.  Thus, rather than prudently *reducing* the outstanding Series D shares subject to redemption before the Redemption Date, the Defendants *increased* them.  As a result, the dilutive event the Rights Offering was meant to forestall occurred, the price of the Company's common stock tanked to basically worthless levels, and Stilwell and the Stilwell Fund Defendants become the effective owners of more than 80 percent of the Company.  There was no viable business rationale for failing to seriously pursue a repurchase of the Series D shares prior to the Redemption Date, and certainly none for paying

interest on the Notes in discounted Series D shares rather than cash when the Redemption Date was on the horizon or had already passed.

6.      However, the Board's and management's decision-making with respect to the Notes has been (and continues to be) compromised by debilitating conflicts of interest.  At all times since the Rights Offering, the majority of the Board members and the CEO were either employees of Stilwell and the Stilwell Fund Defendants (who purchased the vast majority of the Notes) or themselves Notes holders.  The Board and management were thus hopelessly co-opted by individuals with an interest in ensuring that plenty of Series D shares remained outstanding as of the Redemption Date.  The Individual Defendants furthered that goal by deciding (i) not to make a legitimate effort to repurchase the Series D shares despite the impending Redemption Date and (ii) to pay themselves and their fellow insiders Series D shares as interest on the Notes that they knew they would be able to convert to cash or common stock at a profit on or following the Redemption Date.  Each of those decisions was clearly made in the interests of the conflicted insiders, not the interests of the Company or the common stockholders who did not participate in the Rights Offering.

7.      The effect of the Individual Defendants' decisions on the value of the Company has been predictably disastrous.  Due in substantial part to the Series D conversions that have already occurred since the Redemption Date and the resulting conversion discount awarded to the Notes holders, the Company's common stock, which had been trading at roughly $30 per share at the time of the Rights Offering by relative value (taking into account a 1-for-10 reverse stock split that occurred in August 2023), is now trading at just $0.14 per share, representing a remarkable decline in value in less than three years of *over 99 percent*.

8.      The harm to the common stockholders who did not participate in the Rights Offering is similarly apparent.  Beyond the decline in the value of their stock, their overall equity holdings and voting power have been greatly diluted by the conversion rights of the Series D and Notes holders.  These stockholders have effectively lost control of the Company to Stilwell, who has managed to parlay his Notes into an effective 80-plus percent ownership stake.  For example, Plaintiff—who was at one time the Company's largest individual shareholder with over 11 percent of the common stock—had his stake diluted to 1.2 percent or less of outstanding shares, a dramatic reduction in his ownership and voting power of ***approximately 90 percent or more***.  And the Company is still far from paying off all of the Series D shareholders—who retain the option to seek redemption on a monthly basis—and will be unable to do so without further diluting the common stock.  Even so, the conflicted Board and management authorized an *additional* issuance of Series D shares to the Notes holders as interest as late as December 2023.

9.      The decisions by Defendants not to repurchase Series D Preferred Stock prior to the Redemption date and to instead issue interest on the Notes in discounted Series D shares, with full knowledge of the disastrous implications for the Company's capital structure, constitutes a breach of their fiduciary duties of good faith, loyalty, and care.  Through this action, Plaintiff seeks redress for himself, the Company, and the Class of common stockholders who did not participate in the Rights Offering and have thus suffered damages from these wrongful acts, as well as an injunction preventing Defendants from causing any further harm.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1332(d) because the aggregate amount in controversy exceeds $5,000,000 and at least one Class member is a citizen of a state different from a Defendant.

11.     This Court has personal jurisdiction over the Defendants because each Defendant is an individual who either resides in or transacts business and performs work and services in this state, and who has sufficient minimum contacts with this state to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  Each Defendant further caused tortious injury in this state by acts in the state.

12.     Venue is proper under because a substantial part of the events or omissions giving rise to the claims occurred in this district and Wheeler has its principal place of business in this district.

## THE PARTIES

13.     Plaintiff was a director of Wheeler between April 2020 and July 2021 and the CEO of Wheeler between February 2020 and July 2021.  At all relevant times, Plaintiff has been a shareholder of the Company.  Plaintiff is a resident of Boca Raton, Florida.

14.     Defendant Stilwell is the principal and managing member of Stilwell Value LLC, an activist hedge fund that is the investment advisor to other investment funds that comprise what is known as the "Stilwell Group."  Stilwell, Stillwell Value LLC, and certain other members of the Stilwell Group made initial investments in Wheeler in June 2016, after which they launched two proxy fights to reconstitute the Board—an unsuccessful campaign in 2018 followed by a victorious contest in 2019 that resulted in the appointment of Stilwell and two of his appointees to the Board. Stilwell has served as a director of Wheeler since January 2020.  Stilwell is a resident of New York, New York.

15.     Defendant Borrack has been General Counsel for the Stilwell Group since May 2013 and, on information and belief, Borrack's livelihood has been dependent on Stilwell since that time.  Borrack has served as a director of Wheeler since June 2020.  Borrack is a resident of New York, New York.

16.     Defendant Campbell was one of the Stilwell Group's appointees to the Wheeler Board and has served as a director of Wheeler since January 2020.  Campbell is a resident of New York, New York.

17.     Defendant Poskon was one of the Stilwell Group's appointees to the Wheeler Board and served as a director of Wheeler between January 2020 and June 2022.  Poskon is a resident of Reston, Virginia.

18.     Defendant Parisi has been the Director of Communications for the Stilwell Group since January 2010 and, on information and belief, Parisi's livelihood has been dependent on Stilwell since that time.  Parisi has served as a director of Wheeler since November 2022.  Parisi is a resident of San Juan, Puerto Rico.

19.     Defendant Carter has served as a director of Wheeler since December 2019 and as Chair of the Board since February 2020.  Carter is a resident of Dallas, Texas.

20.     Defendant Flemma has served as a director of Wheeler since July 2021.  Flemma is a resident of Thiensville, Wisconsin.

21.     Defendant Bergman served as a director of Wheeler between July 2021 and June 2023.  Bergman is a resident of New York, New York.

22.     Defendant Pollack has served as a director of Wheeler since June 2023.  Pollack is a resident of New York, New York.

23.     Defendant Franklin was Chief Operating Officer of Wheeler between June 2014 and October 2021, was named interim CEO of Wheeler in July 2021, and has served as CEO of Wheeler since October 2021.  Franklin is a resident of Silver Spring, Maryland.

24.     Defendants Stilwell, Borrack, Campbell, Poskon, Parisi, and Franklin are referred to collectively as the "Conflicted Insiders."

25.     Defendant Stilwell Value is a Delaware limited liability company with its principal place of business in New York, New York.  Stilwell Value is the general partner of the other Stilwell Fund Defendants and is owned and managed by Stilwell.

26.     Defendant Stilwell Value Partners VII, L.P. is a Delaware limited partnership with its principal place of business in New York, New York.

27.     Defendant Stilwell Activist Fund, L.P. is a Delaware limited partnership with its principal place of business in New York, New York.

28.     Defendant Stilwell Activist Investments, L.P. is a Delaware limited partnership with its principal place of business in New York, New York.

29.     Defendant Stilwell Associates, L.P. is a Delaware limited partnership with its principal place of business in New York, New York.

30.     Nominal Defendant Wheeler is a Maryland real estate investment trust established in 1999 that owns, leases, and operates over eight million square feet of commercial real estate, with a primary focus on grocery-anchored shopping centers.  It is publicly traded on the NASDAQ under the ticker "WHLR."  The principal office address of Wheeler is 2529 Virginia Beach Boulevard, Suite 200, Virginia Beach, VA 23452.

## STATEMENT OF FACTS

### Wheeler Offers Convertible Series D Preferred Stock

31.     In September 2016, Wheeler registered and offered 1,600,000 shares of its Series D Preferred Stock, which would receive quarterly dividends at 8.75 percent per annum of their $25 liquidation preference until September 21, 2023, and then at a cumulative rate of an additional 2 percent per annum for each subsequent year the dividends were not paid in full, subject to a maximum annual dividend rate of 14 percent.  The Company was eligible to redeem the Series D shares on or after September 21, 2021 for $25 per share (plus all accrued and unpaid dividends) in

cash, until the Redemption Date (September 21, 2023).  Prior to the Redemption Date, the Series D shares were convertible at the holders' option to common stock at a price of $16.96 per share of common stock.  On or after the Redemption Date, the holder could cause the Company to redeem the shares for $25 per share (plus all accrued and unpaid dividends) in cash or shares of common stock.  The Series D shares have no stated maturity date or general voting rights.

32.     In January 2018, Wheeler issued an additional 1,552,392 Series D shares for a price of $16.50 (the "Series D Issuance"), well below the Series D liquidation preference (and redemption price) of $25.  Following the Series D Issuance, the Company had over 3 million Series D shares issued and outstanding.

33.     In December 2018, the Company announced that it would not pay its fourth quarter dividends for the Series D shares "as part of its ongoing evaluation of strategic alternatives."  Those dividends have been suspended, and thus accruing, ever since.

**Stilwell Complains About the Series D Issuance and Establishes a Foothold at Wheeler**

34.     In June 2016, Stilwell and the Stilwell Fund Defendants began to invest in Wheeler stock, steadily increasing their position until, as of November 2017, they collectively owned 849,983 shares of the Company, or 9.7% of the outstanding common stock.  At that time, Stilwell filed a solicitation nominating himself, Defendant Poskon, and Corissa Briglia Porcelli for election as directors at the next annual meeting of Wheeler stockholders.  In June 2018, Stilwell followed up with a letter to Wheeler stockholders that included only the following graphic and text concerning certain Board members up for reelection at the upcoming annual meeting:

Dear Fellow WHLR Owner,



You would think they would resign for shame!

35.     Prior to the 2018 annual meeting, Stilwell expanded on his criticism of the Wheeler Board, stating in a letter to stockholders that they had overseen a "prolonged common stock price underperformance."  Stilwell went on to express concerns about the Series D Issuance, calling it "dilutive and therefore harmful to Wheeler common stockholders" and questioning the pricing of the Series D Issuance, which was set at an $8.50 discount to its $25 face value, noting that he found it "difficult to understand how the Board approved the issuance of additional preferred debt to such a deep discount to face value."

36.     Despite his criticism of the offering, Stilwell purchased 25,400 shares of Series D Preferred Stock in September 2018, increasing his Wheeler holdings to 9.8 percent of outstanding shares.  On October 3, 2018, the stockholder annual meeting was held, and Stilwell's Board nominees were convincingly defeated.

37.     Stilwell initiated a second proxy fight prior to the 2019 annual meeting.  This time, Stilwell nominated himself, Defendant Poskon, and Defendant Campbell to the Board.  To

convince stockholders to elect his nominees to the Board, Stilwell again pointed to Wheeler's underperforming stock and the Company's "poor capital allocation decisions," including the Series D Issuance.  Specifically, Stilwell called the redemption rights of the Series D Preferred Stock a "Death Spiral provision" and complained that the Series D Issuance "exposes the common stockholders to great[] consequences in the future" because, following the Redemption Date, "[i]f all of the Series D holders decide to redeem their . . . preferred shares, Wheeler would have to pay $90,015,900 in cash or issue the common stock equivalent, thereby significantly diluting existing common stockholders and even potentially wiping out existing common stockholders."  Stilwell questioned "how Wheeler can be finished with or close to finishing asset sales when the Board has yet to address (or even mention) the serious consequences of the optional Series D Preferred Stock redemption in 2023" and expressed his belief that "the Board needs to ensure that Wheeler continues selling underperforming properties to generate cash to buy back the Series D Preferred Stock."  Stilwell undeniably appreciated—and was concerned about—the implications for Wheeler of failing to reduce the outstanding Series D shares prior to the Redemption Date.

38.  On December 19, 2019, the Wheeler stockholders voted to elect all three of Stilwell's nominees, who replaced outgoing directors David Kelly (who was CEO at the time), Jeffrey Zwerdling, and John McAuliffe on the Board beginning January 1, 2020.  In addition, another director—Carl McGowan, Jr.—resigned effective December 31, 2019, leaving the Company with seven directors and Stilwell with a near majority of the Board.

39.  Stilwell used his newly acquired influence to reconstitute the Board and replace management of the Company.  First, he and his fellow directors filled the Board vacancy by adding Plaintiff to the Board on February 25, 2020.  Second, they appointed Defendant Carter as Chair of the Board.  Third, they replaced David Kelly as CEO with Plaintiff on April 13, 2020.  Fourth,

they put the election of only seven members of the Board to a stockholder vote at the 2020 annual meeting—excluding a pre-Stilwell director—each of whom was approved by the stockholders on May 28, 2020.  Fifth, they expanded the Board from seven members back to eight and appointed Defendant Borrack—the General Counsel of the Stilwell Group—as the eighth director on June 19, 2020.  By the fall of 2020, half of the Board was comprised of Stilwell appointees or employees.

40.     With firm control over the Board, Stilwell began to increase his holdings in the Company, extending his percentage ownership of the Company to 13.1 percent by the end of 2020, including by purchasing additional Series D shares.

## The Conflicted Insiders Orchestrate, and Take Advantage of, the Rights Offering

41.     Under Plaintiff's leadership, the Company began to adopt a prudent strategy of buying back Series D shares to prevent a crisis at the Redemption Date.  In late 2020 and early 2021, the Company made two tender offers to repurchase Series D Preferred Stock through which the Company bought back, respectively, 11 percent and 3.2 percent of outstanding shares.

42.     But Stilwell and the other Conflicted Insiders saw the Series D Preferred Stock as an opportunity to enrich themselves and further expand their control over the Company.  Unsatisfied with Plaintiff's judicious approach to handling the Company's capital, they pushed Plaintiff to resign as CEO and withdraw from consideration for reelection to the Board on July 5, 2021, installing Defendant Franklin as interim CEO and again reducing Board membership to seven directors—four of whom remained Stilwell appointees or employees and two of whom (Defendants Bergman and Flemma) replaced non-Stilwell appointees.

43.     Immediately thereafter, the Stilwell-majority Board designated an additional 2,000,000 shares of the Company's authorized but unissued preferred stock as Series D Preferred

Stock and announced the Rights Offering.  While a July 22, 2021 press release from the Company explained the Rights Offering, it was not well-marketed to stockholders.

44.     Under the terms of the Rights Offering, each of the Company's common stockholders received non-transferable subscription rights to purchase the Notes at a rate of one right for every eight shares of common stock owned.  Each right would allow the holder to subscribe for $25 principal amount of Notes.  The Notes would bear interest at 7 percent annually, which would be paid twice per year in either cash, Series B Preferred Stock, or Series D Preferred Stock.  Interest paid in Series B or Series D shares would be discounted 45 percent from the 15-day average closing price for the relevant security on the open market.  The Notes were convertible at any time to common stock at a price of $6.25 per share of common stock ("Conversion Price") at the holder's option and would be automatically converted to common stock at the Conversion Price upon a change in control.  On or following the Redemption Date, if at least 100,000 Series D shares were redeemed for common stock, the conversion rate for Notes would be discounted to the lesser of (i) 45 percent below the Conversion Price or (ii) 45 percent below the lowest rate at which a Series D shareholder had converted the Series D shares.

45.     The Rights Offering made available a maximum of $30 million in Notes.  In the event the Rights Offering was not fully subscribed, common stockholders who had otherwise fully exercised their rights would be permitted to exercise an "over-subscription privilege" to purchase additional, unsubscribed Notes at the same price.  The Rights Offering was set to expire at 5:00 p.m. New York City time on August 13, 2021.

46.     According to the prospectus for the Rights Offering, filed with the SEC on July 22, 2021, the primary purpose for the Board's approval of the Rights Offering was "to raise sufficient capital to fund future repurchases of . . . Series D Preferred Stock," of which approximately 3.1

million shares were outstanding as of that date.  The prospectus went on to explain that if further repurchases of Series D shares were not made by the Redemption Date, "there is a significant risk that we will not have sufficient cash to pay the aggregate redemption price, and would not be able to meet our redemption obligation without liquidating assets and/or substantial dilution of our Common Stock, which in turn would significantly reduce the value of any Common Stock paid to settle the redemption amount."  The Board and management plainly understood the gravity of the potential consequences should the Company fail to reduce the amount of outstanding Series D Preferred Stock before the Redemption Date.

47.     After the Rights Offering closed, on August 13, 2021, the Company announced that $30 million in aggregate principal amount of Notes—or 1,200,000 Notes—were issued, including $6,264,025 in aggregate principal amount of Notes (or 250,561 Notes) issued pursuant to the basic subscription privilege, $21,543,500 in aggregate principal amount of Notes (or 861,740 Notes) issued pursuant to the aforementioned over-subscription privilege, and $2,192,475 in aggregate principal amount of Notes (or 87,699 Notes) issued to third-party entities who backstopped the offering (the "Backstop Parties").

48.     Of the 1,112,301 Notes issued to investors not otherwise involved in the Rights Offering (excluding Notes issued to the Backstop Parties), 1,011,339 were purchased by the Conflicted Insiders—representing *over 90 percent* of the available Notes—including 999,995 Notes purchased by Stilwell (personally or through the Stilwell Fund Defendants) for nearly $25 million.  In addition to Stilwell, Defendant Poskon purchased 6,275 Notes for $156,875, Defendant Campbell purchased 4,000 Notes for $100,000, and Defendant Franklin purchased 1,069 Notes for $26,725.  Notably, the Notes represented the *entirety* of Defendant Campbell's stock ownership in the Company, nearly all of Defendant Franklin's holdings in the Company, and half of Defendant

Poskon's portfolio of Company stock, assuming the standard Conversion Price. Stillwell and the Stilwell Fund Defendants increased their effective ownership of the Company following the Rights Offering to 37.8 percent, also assuming the standard Conversion Price.

49.     The Rights Offering was thus dominated by the Conflicted Insiders and gave the majority of the Board members—including Defendant Borrack, who was employed by Stillwell—and the CEO an incentive to maximize the value of the Notes they had purchased, no matter the effect on the common stock price. This meant preserving the amount of outstanding Series D Preferred Stock subject to redemption on or following the Redemption Date in order to benefit from the discounted conversion rate on the Notes following redemption of 100,000 Series D Shares, despite Stillwell and the other Conflicted Insiders undoubtedly understanding the dilutive effects of these redemption and conversion rights on the common stock, and despite their explicitly listing the repurchase of outstanding Series D shares prior to the Redemption Date as one of the primary reasons for the Rights Offering in the first place.

50.     Indeed, the actions taken by the Individual Defendants since the time of the Rights Offering can only be explained by self-interest, bad faith, or gross negligence. For example, while Wheeler reported in its 10-Q for Q3 2021 that the Company had $489,379,000 in total assets, including nearly $400 million in investment properties and over $35 million in cash or cash equivalents, and that its exposure to Series D Preferred Stock was just above $100 million (the combined $75 million liquidation preference and $25 million in unpaid dividends), the Individual Defendants took no steps to use the Company's cash on hand or other assets to buy back Series D shares. Quite the opposite, the Board determined less than a month after the 10-Q was filed to *issue more* Series D Preferred Stock to pay interest to all Notes holders at a 45 percent discount in

lieu of cash, both overpaying the Notes holders (including the Conflicted Insiders) and increasing the Company's exposure to redemption of the Series D shares.

51.     As interest payments for the Notes in December 2021, the Conflicted Insiders thus received 87,126 Series D shares at a 45-percent discount to market price, with Stilwell and the Stilwell Fund Defendants obtaining 86,150 shares convertible to common stock, raising their ownership percentage in the Company to 38.1 percent.  Thus, the number of outstanding Series D shares increased from 3,038,683 to 3,152,392, and the redemption cost to the Company at the Redemption Date increased by at least $2,842,725 (without accounting for unpaid dividends).

52.     In late 2021, Plaintiff responded to these decisions by submitting multiple letters to the Board criticizing the Board for "forcing [him] out" as CEO and "allow[ing] transactions to proceed despite substantial conflicts of interest."  Specifically, Plaintiff noted that despite the Board announcing publicly that he had resigned, he had actually been told that the Board "no longer had confidence in [him] and that [his] employment as CEO was being terminated."  He also directly accused the Board of "act[ing] in their own self-interest and contrary to the best interests of the Company in breach of their fiduciary duties."  Rather than authorize any corrective action or even take these allegations seriously, the Board brushed them aside, responding tersely: "We are saddened by your recent public letters.  While your short 16-month tenure as CEO had its pluses and minuses, we respected your written decision to resign for personal reasons when confronted with some of these minuses.  We wish you the best in your retirement in Florida."  At the time, Plaintiff could not have known the extent to which the Board and management would ultimately flout their fiduciary obligations.

**The Board and Management Resist Making a Genuine Offer to Buy Back Series D Shares**

53.     In its 10-K for FY 2021 filed with the SEC on February 28, 2022, the Company stated that following the interest payments on the Notes in December 2021, "the outstanding Series D Preferred has a liquidation preference of approximately $78.81 million, with aggregate accrued and unpaid dividends in the amount of approximately $26.16 million."   In other words, the Company anticipated that as of the Redemption Date, it could be required to pay over $100 million dollars in cash or common stock to satisfy Series D shareholders' redemption rights.  The Company concluded that "there is a significant risk that the Company will not have sufficient cash to pay the aggregate redemption price, and would not be able to meet its redemption obligation without substantial dilution of its common stock."

54.     Despite recognizing this encroaching problem, throughout 2022, the Conflicted Insiders refused to adequately address the impending redemption, incentivized instead to maintain sufficient outstanding Series D shares to trigger the conversion discount on the Notes that would increase the value of their personal holdings.  Though they decided to pay interest on the Notes in June 2022 and December 2022 in discounted Series B—rather than Series D—shares (which increased Stilwell's ownership to over 40 percent of the Company), they did not make any serious offer to buy back Series D shares, with the Redemption Date now less than a year away.

55.     The Board underwent a minor reshuffling when Defendant Poskon decided not to run for reelection and her directorship expired in June 2022.  On October 28, 2022, the Board voted to elect Defendant Parisi to replace Poskon as a director effective November 1, 2022.  Parisi had served as the Director of Communications at the Stilwell Group for 12 years in advance of her election to the Board and was thus beholden to Stilwell.  Her appointment allowed Stilwell to maintain a majority of the Board who were Conflicted Insiders.

56.     In November 2022, following Parisi's appointment to the Board, the Company announced a solicitation for what it called "the Company's final attempt to provide holders of the Series D Preferred Stock . . . with an opportunity to receive value for their Series D Preferred Stock prior to the Series D Redemption Date" (the "Exchange Offer").  However, the Exchange Offer had little appeal to Series D shareholders—in it, the Company offered to exchange up to 2,112,103 of the approximately 3.15 million outstanding Series D shares (each subject to a redemption price of $25) for $16 in principal amount of 6 percent subordinated notes due in 2028 that would be convertible to common stock at $12.50 per share of common stock, and an additional 0.5 shares of common stock, *only if* the participating Series D shareholders would agree to consent to modify the terms of their Series D shares, including by forfeiting their redemption rights.  The Exchange Offer was also conditional upon the satisfaction of certain conditions, including that at least two-thirds of the outstanding shares were validly tendered.  Ultimately, only 864,391 Series D shares—representing just 26.8 percent of the outstanding Series D shares—were validly tendered in the Exchange Offer, and thus all Series D shares remained outstanding.

57.     It is no wonder the Exchange Offer failed—it asked Series D shareholders to sacrifice roughly $9 in value for each Series D share they maintained, as well as accept reduced interest.  And even if the Exchange Offer had been successful, *at best* more than one million Series D shares would have remained outstanding.  But the Conflicted Insiders had no interest in reducing the outstanding Series D shares; on the contrary, they had a personal financial interest in *preserving* the amount of outstanding preferred stock so that they could profit from discounted conversion rates on their Notes after the Redemption Date.

58.     It is inexplicable that the Exchange Offer was the best and final offer made by the Board and management to purchase Series D shares before the Redemption Date.  Indeed, there

was no business justification for failing to buy back all or nearly all Series D shares with the Redemption Date fast approaching.  The Company's 10-K for FY 2022, filed with the SEC on March 2, 2023, stated that the value of the Company's assets had substantially increased since the Rights Offering, totaling $684,536,000 as of December 31, 2022—with investment properties alone worth $560,980,000—while the Company's total liabilities were only $531,984,000.  The Company also claimed to have cash or cash equivalents of approximately $28.5 million.  The Company could have easily sold some of its properties to increase its offer to Series D shareholders.  In fact, the Company could have sold only *4 percent* of its total assets to generate enough cash—approximately $28 million—to cover the $9 per share difference between the redemption value of the Series D shares and what was presented in the Exchange Offer.  Alternatively, the Company could have used the available cash on hand to cover all or part of the difference, which would have been consistent with the stated goal of the Rights Offering—to assist the Company in buying back the Series D shares.  The Conflicted Insiders' self-interested resistance to taking any of these common-sense steps to protect the Company and its shareholders constituted clear breaches of their fiduciary duties of good faith, loyalty, and due care.

59.   Unsurprisingly, the Board and management provided no explanation for their refusal to provide a legitimate offer to the Series D shareholders.  All they could muster was a conclusory statement in the 10-K that "[t]he Company does not believe it is in its interests to liquidate assets or incur indebtedness to fund cash redemptions of the Series D Preferred Stock," neglecting to even mention the Company's available cash on hand.  At the same time, the 10-K underscored the gravity of the Company's impending crisis, stating: "Assuming dividends continue to accrue and remain unpaid on the Series D Preferred, then on the Series D Redemption Date we estimate that the aggregate liquidation preference . . . would be approximately $78.81

million, with aggregate accrued and unpaid dividends in the amount of approximately $40.99 million, for a total liquidation value of $119.80 million."

60.     On April 11, 2023, Plaintiff again submitted a letter to the Board, this time explicitly challenging the Board's and management's continued refusal to address the oncoming crisis.  Plaintiff stated that the "Company's leadership has had more than three years since the election of Joseph Stilwell at the 2019 annual meeting of stockholders to address the potentially destabilizing consequences of the upcoming redemption of the Series D preferred stock, which optional redemption right vests on September 22, 2023,  but unfortunately has not yet successfully resolved this issue.  This upcoming redemption date is critical to ensure value creation for all of the Company's security holders."

61.     Plaintiff also warned the Board against continuing to issue discounted Series D Preferred Stock as interest to Notes holders, describing such issuances as "not only manifestly unfair and substantially dilutive but, most importantly, contrary to the Board's fiduciary duties." Plaintiff asked the Board to have a constructive conversation concerning these issues.   The Board did not respond directly, but rather issued a dismissive letter through its outside counsel.

62.     On May 11, 2023, Plaintiff wrote another letter to the Board, emphasizing the urgency for the Board and management to reverse course and abide by their fiduciary obligations to the Company and its shareholders before the Redemption Date.  The letter urged the Board and management to, among other things, "immediately begin negotiating a settlement with the holders of the Company's Series D preferred stock" and "stop issuing deeply discounted preferred securities in lieu of cash interest payments on the Company's 7.00% subordinated convertible notes due 2031."  Plaintiff attributed the Company's "massive stock depreciation" to "the Board

and management's reckless pursuit of value-destructive strategies, including the incomprehensible decision to pay interest on the Convertible Notes in anything other than cash."

63.    Plaintiff also pointed out that the Board's and management's decision-making was indicative of a "concerted effort to shift value away from the common and preferred stockholders to Mr. Stilwell and a few other minority noteholders."  Specifically, Plaintiff wrote that the strategy to pay interest on the Notes in discounted Series D shares was "for the benefit of essentially one director" because it "dilutes stockholders, while allowing Mr. Stilwell to be the primary beneficiary" as "the beneficial owner of over 80% of the Convertible Notes."

64.    Plaintiff nevertheless identified for the Board a "potential path forward," which would require the Company, among other things, to make "a meaningful offer to the [Series D] holders, such as an offer that combines cash, notes and common stock" and to "pay cash for the interest payments" on the Notes from that point on.

### The Conflicted Insiders Further Enrich Themselves by Issuing Additional Series D Shares

65.    Incredibly, on May 19, 2023, just eight days after receiving Plaintiff's letter, the Board and management determined to pay interest on the Notes for June 1, 2023 in Series D Preferred Stock, increasing the amount of outstanding Series D shares by 156,211 (and their aggregate liquidation value by $8.1 million) just four months before the Redemption Date.  Rather than heed Plaintiff's warnings, the Conflicted Insiders again determined to act purely in their own interest by (i) paying themselves in deeply discounted Series D Preferred Stock that they knew would be subject to redemption at a much higher value in just four months' time, and (ii) ensuring that the outstanding amount of Series D stock would be sufficient to provide them discounts to the Conversion Price on their Notes.

66.     Moreover, contrary to Plaintiff's request, no further efforts were made by the Board or management to negotiate a buy-back with the Series D shareholders.  On the contrary, on June 1, 2023, the Board—led by Stilwell—diverted Company funds that otherwise could have been used to settle Series D shares to invest $3.5 million for limited partnership interests in Defendant Stilwell Activist Investments, L.P., one of the Stilwell Fund Defendants that is owned and controlled by Stilwell.  The Individual Defendants thereby explicitly enriched Stilwell and his fund with cash that should have been used to reduce the outstanding Series D shares for the benefit of the Company and all of its common stockholders.

67.     On June 2, 2023, Defendant Bergman tendered her resignation from the Board.  On August 31, 2023, the Board elected Defendant Pollack to replace Bergman as a director effective September 5, 2023.

68.     On June 12, 2023, Plaintiff delivered his final plea to the Board to avert the upcoming catastrophe on the Redemption Date.  He implored the Board and management to "stop disregarding stockholders' interests and making self-interested decisions that appear to insulate themselves from the Company's performance."  He pointed, as an example, to the fact that Defendant Campbell had sold all of his common stock in the Company and held only Notes, asking rhetorically, "[w]ho is Mr. Campbell running the Company for – the common stockholders or the noteholders?"  He concluded with one last missive: "The Company is now in crisis.  Urgent action by the Board and management is necessary. . . .  The decisions that need to be made are obvious.  And, even if they weren't intrinsically obvious to management, I have made them so in two (now three) separate letters.  There is no more time to waste."

69.     As before, the Board and management simply ignored Plaintiff's warnings and began to prepare for the Redemption Date, with full knowledge of the harm their failure to act

would have on the Company and the Class.  Specifically, when the Company filed its 10-Q for Q2 2023 on August 8, 2023, it reported assets of $673,362,000, including $558,423,000 in real estate and $28,735,000 in cash or cash equivalents.  Still, the Board and management did nothing to address the outstanding Series D shares, stating in the 10-Q again (without any apparent basis) that "[t]he Company does not believe it is in its interests to liquidate assets or incur indebtedness to fund cash redemptions of the Series D Preferred Stock."  Instead, the Board and management made clear that "the Company intends to settle redemptions of Series D Preferred following the Series D Redemption Date in Common Stock," while admitting their knowledge that such decision "will result in a substantial dilution of the outstanding Common Stock."

70.     The Company's stock price had already suffered dramatically due to the impending dilutive event, falling below Nasdaq's minimum bid price of $1.00 beginning in May 2023. Purportedly to correct this deficiency, the Board authorized a 1-for-10 reverse stock split of shares of common stock, which took effect on August 17, 2023.  The reverse stock split effectively increased the Conversion Price for the Notes to $62.50 per share of common stock, reducing the conversion rate for the Notes from four shares of common stock for each $25 principal amount of Notes to 0.4 shares of common stock for each $25 principal amount of Notes.  However, the reverse stock split *did not* eliminate the conversion *discount* for the Notes that would occur upon the redemption of 100,000 Series D shares, meaning the Notes holders' conversion rate could be expected to leap right back to, *and even exceed*, the original rate of four shares of common stock per $25 principal amount of Notes once the Redemption Date passed.

71.     Even so, rather than use any available cash to buy back the Series D shares, on September 1, 2023, Defendants Campbell and Carter—the members of a newly-formed "Related Person Transactions Committee"—authorized the Company to make a *second* $3.5 million

investment for limited partnership interests in Defendant Stilwell Activist Investments, L.P. Again, the Individual Defendants diverted funds that could have been utilized to boost the value of the Company and its common stock to instead enrich Stilwell (and his fund) individually.

72.     With less than a month remaining before the Redemption Date, the Company issued over 100 million shares of common stock at $0.01 par value per share, explicitly to account for the possibility that either (i) all Series D shares would be redeemed in common stock at the liquidation price of $25 per share plus all accrued but unpaid dividends, or (ii) all Series D shares would be converted to common stock at the conversion price of $169.60 per share of common stock (taking into account the impact of the reverse stock split).  On September 7, 2023, the Company posted forms on its website that Series D shareholders were required to complete if they wanted to redeem any or all of their Series D shares.  The Company said redemptions would be processed monthly beginning in October 2023.

73.     In the first month of redemptions alone, the Company redeemed 172,241 Series D shares at a redemption price of approximately $37.48 (accounting for the $25 liquidation price and all accrued but unpaid dividends).  With the common stock price at approximately $2.89 per share following the reverse stock split, the Company issued to the Series D shareholders 2,236,890 shares of common stock at an aggregate redemption price of approximately $6.46 million.

74.     Thus, in the first month following the Redemption Date, the Conflicted Insiders succeeded in accomplishing their self-interested objective of triggering an extremely steep discount on the Conversion Price for their Notes.  Because over 100,000 Series D shares had been redeemed at $2.89 per share of common stock, the Conversion Price was adjusted from $65.25 per share of common stock following the reverse stock split to just $1.59 per share of common stock for every $25 of principal amount of Notes being converted.  This effectively negated the impact

of the reverse stock split on the value of the Notes because it triggered an actual conversion rate of 15.72 shares of common stock for every \$25 of principal amount of Notes being converted, a **3,830 percent increase** from 0.4 shares of common stock per Note, which had been the going rate following the reverse stock split.

75.     As a direct result, Stilwell's beneficial ownership of the Company **more than doubled** in the first month following the Redemption Date to an astounding **83.7 percent** of the Company's common stock, as of October 20, 2023, with the right to convert his Notes into over 15 million shares of common stock. The Class, on the other hand, suffered severe dilution of their common stock, precipitating an additional decline in the price of the common stock.

76.     The situation further deteriorated in the second month of redemptions, November 2023. In that month, 319,762 Series D shares were redeemed at a redemption price of \$37.76. However, because the price of the common stock had fallen to \$0.84, the Company was forced to issue 14,355,723 shares of stock to settle the aggregate redemption price of approximately \$12.1 million. Moreover, the Conversion Price of the Notes was further reduced to \$0.46 per share of common stock, or approximately 54.05 shares of common stock for each \$25 of principal amount of Notes being converted, a **13,412.5 percent increase** from the original conversion rate. The Notes holders thus established further control over the Company at the expense of the Class.

77.     The Company's common stock price continued to decline. On November 14, 2023, the Company announced that its issuance of over 100 million shares of common stock may no longer be able to cover redemption requests, and that it accordingly "may have to settle future redemption requests by holders of the Company's Series D Cumulative Convertible Preferred Stock with unregistered shares of Common Stock or delay delivery of registered Common Stock."

78.     At the same time, the Company remained asset-rich, with a reported $671,937,000 in assets in its 10-Q for Q3 2023, including real estate valued at $562,219,000 and cash or cash equivalents of $25,419,000.  An independent and prudent Board and management team would have undoubtedly determined to pay any interest on the Notes in cash rather than discounted Series D shares that would be immediately redeemable to common stock when the Company had an insufficient supply of common stock to cover the redemption of even outstanding Series D shares.

79.     Nevertheless, the Conflicted Insiders brazenly decided on November 15, 2023—just one day after announcing the Company did not have sufficient common stock to cover redemption requests—to issue *additional* discounted Series D shares as interest to Notes holders in lieu of cash (or even Series B shares), increasing the amount of outstanding Series D shares that were immediately eligible for redemption and the corresponding exposure to the Company.  Such decision can only be understood to promote the personal financial interests of the Conflicted Insiders, and Stilwell in particular, in overpaying themselves in discounted stock and, at the same time, increasing their ownership stake in the Company to the detriment of the Class.  At best, this decision by the Individual Defendants was made in bad faith or through gross negligence.  In any event, it represents an egregious breach of the Individual Defendants' fiduciary duties of good faith, loyalty, and due care to the Company and the vast majority of its common stockholders.

**While the Company and the Class Continue to Suffer, the Conflicted Insiders Prosper**

80.     Stilwell further consolidated his power when, on December 5, 2023, the Company entered into an agreement with Stilwell and the Stilwell Fund Defendants to create a special "Capital Stock Excepted Holder Limit" of 55 percent and "Common Stock Excepted Holder Limit" of 86 percent in exchange for a one-year agreement by Stilwell and the Stilwell Fund Defendants not to convert their Notes into shares of common stock to an extent that would make

Stilwell the direct or indirect owner of more than 50% of the Company's voting power (the "Stilwell Agreement").  The Stilwell Agreement replaced the pre-existing aggregate stock ownership limit of just 9.8 percent set out in the Company's Charter with the "percentage limit established by the Board," which dwarfed the original percentage limit.

81.     The Stilwell Agreement did nothing to remedy the harm suffered by the Company or the Class and was rather a transparent attempt to entrench Stilwell's control while preventing him from being labeled as a controller and subjected to enhanced judicial scrutiny.  Indeed, the fig-leaf, one-year term of the Stilwell Agreement would give Stilwell the power, at the end of 2024, to firmly establish himself as the Company's majority owner and chief decision-maker, completing his takeover that began with his failed proxy fight in 2018.

82.     Immediately after entering into the Stilwell Agreement, the Company announced that it redeemed 371,653 Series D shares in the third month of redemptions at a redemption price of approximately $38.02 per share, which, at the common stock price of merely $0.39 per share, required the issuance of an additional 36,194,825 shares of common stock for an aggregate redemption price of approximately $14.1 million.  The continued decline of the common stock price resulted in a further discount on the Conversion Price of the Notes to $0.21 per share of common stock, or 116.46 shares of common stock for each $25 of principal amount of Notes being converted—a ***29,015 percent increase*** from the original conversion rate.

83.     The common stock price, and thus the Conversion Price for the Notes, has continued to fall in 2024.  For January 2024 redemptions, the lowest redemption price was $0.31 per share of common stock and the corresponding Conversion Price for the Notes was $0.17 per share of common stock (or approximately 148.24 shares of common stock for each $25 of principal amount of Notes being converted).  For February 2024 redemptions, the lowest redemption price

was $0.22 per share of common stock and the corresponding Conversion Price for the Notes was $0.12 per share—approximately 209.84 shares of common stock for each $25 of principal amount of Notes being converted and a ***52,360 percent increase*** from the original conversion rate.

84.     In fact, the downward spiral of the value of the Company's common stock has become so dire that the Board was forced to amend the Stilwell Agreement to raise Stilwell's beneficial ownership limits to 60 percent of the Company's capital stock and 90 percent of the Company's common stock, further increasing his control while the value of the Company and the common stock has continued to crumble.  As of February 5, 2024, Stilwell and the Stilwell Fund Defendants beneficially owned over ***245 million shares*** of the Company's common stock, the vast majority of them subject to conversion of the Notes.

85.     The Conflicted Insiders' scheme was best summed up by Stilwell himself in a letter to his investors dated February 8, 2024, in which he succinctly laid out how he and the other Conflicted Insiders were able to enrich themselves at the expense of the Class.  He explained that "[a]lthough [Wheeler's] common stock price has collapsed," the investments by Stilwell and the Stilwell Fund Defendants "are doing great," which success he attributed to their ability to "purchase the lion's share of [Notes]."  As Stilwell elaborated, Wheeler's "capital stack issues"— *i.e.*, the outstanding Series D shares—"were, to our great surprise *and actually to our benefit*, not resolved in 2023."  Accordingly, "[a]s D's tender each month, [Notes holders] own a greater percentage of W[heeler]—*to our benefit*.  Our losses (and those of any shareholder who subscribed in the rights offering) on our common stock position have *been recouped several times over* through our ownership of the [Notes]."

86.     Stilwell thus admitted that it was to the benefit of himself and other Notes holders (including Defendants Campbell, Poskon, and Franklin) *not to resolve* the Company's Series D

exposure prior to the Redemption Date and, instead, to ensure that Series D shareholders would continue to tender their shares following the Redemption Date, which would increase the value of the Notes and the Notes holders' percentage ownership of the Company.  It is hardly surprising that the Board and management—comprised of a majority of Notes holders and Stillwell employees—made no real effort to buy back the Series D shares and, instead, increased the number of outstanding shares by issuing themselves discounted Series D shares as interest on the Notes.

87.     Stilwell also recognized that while the Conflicted Insiders have continued to amass control over the Company, Plaintiff's and the Class's investments in Wheeler's common stock have become worthless.  They have been substantially diluted, controlling less and less voting power in the Company with each passing month of Series D redemptions, and, as a result, the Company's stock price has bottomed out, from a relative value of $30 per share at the time of the Rights Offering (accounting for the reverse stock split) to a mere $0.14 per share on April 9, 2024.

88.     The Company's Board and management are still dominated by the Conflicted Insiders, who remain in control of the Company's decisions on the payment of interest on the Notes.  Without the Court's intervention, there is little doubt that the Individual Defendants will continue to issue discounted Series D shares as interest and accept Series D tenders at extremely low prices, increasing the value of the Notes until Plaintiff's and the Class's common stock interests are completely wiped out.  The Individual Defendants should be held to account for their breaches of fiduciary duty and enjoined from further enriching the Conflicted Insiders.

### Demand Is Excused as to the Wheeler Board for Plaintiff's Derivative Claims

89.     The current Board of Wheeler is comprised of Defendants Stilwell, Borrack, Campbell, Parisi, Carter, Flemma, and Pollack (the "Demand Board").  Plaintiff has not made a demand on the Demand Board to investigate or pursue the derivative claims herein because demand is excused as futile.

90.    As more fully detailed below, demand would be futile, and is thereby excused, because four of the seven members of the Demand Board are so personally and directly conflicted or committed to the decisions in dispute that they cannot reasonably be expected to respond to a demand in good faith.

91.    Defendant Stilwell cannot reasonably be expected to respond to a demand in good faith because he is a Conflicted Insider who faces a substantial likelihood of liability due to his self-interested and conflicted decision-making with respect to the Company's failure to make a genuine effort to buy back Series D shares prior to the Redemption Date and payment of interest to Notes holders in the form of discounted Series D shares rather than cash.

(a)    As described above, by virtue of his ownership of Notes, Stilwell stood to benefit from the redemption of Series D shares at a discount to the Conversion Price of the Notes and from the payment of discounted Series D shares as interest on the Notes, and thus had a disabling financial interest in any decision as to whether to buy back the Series D shares prior to the Redemption Date and in what form to pay interest on the Notes.

(b)    Stilwell, in his capacity as a member of the Board, participated (and continues to participate) in decision-making regarding the Company's efforts (or lack thereof) to buy back Series D shares and the issuance of interest on the Notes.  Stilwell thus faces a substantial likelihood of liability on the claims subject to a litigation demand.

92.    Defendant Borrack cannot reasonably be expected to respond to a demand in good faith because he is a Conflicted Insider who faces a substantial likelihood of liability due to his self-interested and conflicted decision-making with respect to the Company's failure to make a

genuine effort to buy back Series D shares prior to the Redemption Date and payment of interest to Notes holders in the form of discounted Series D shares rather than cash.

(a)   As described above, Borrack's employer, Stilwell, stood to benefit from the redemption of Series D shares at a discount to the Conversion Price of the Notes and from the payment of discounted Series D shares as interest on the Notes, and thus Borrack had a disabling financial interest in any decision as to whether to buy back the Series D shares prior to the Redemption Date and in what form to pay interest on the Notes.

(b)   Borrack, in his capacity as a member of the Board, participated (and continues to participate) in decision-making regarding the Company's efforts (or lack thereof) to buy back Series D shares and the issuance of interest on the Notes.  Borrack thus faces a substantial likelihood of liability on the claims subject to a litigation demand.

93.   Defendant Campbell cannot reasonably be expected to respond to a demand in good faith because he is a Conflicted Insider who faces a substantial likelihood of liability due to his self-interested and conflicted decision-making with respect to the Company's failure to make a genuine effort to buy back Series D shares prior to the Redemption Date and payment of interest to Notes holders in the form of discounted Series D shares rather than cash.

(a)   As described above, by virtue of his ownership of Notes, Campbell stood to benefit from the redemption of Series D shares at a discount to the Conversion Price of the Notes and from the payment of discounted Series D shares as interest on the Notes, and thus had a disabling financial interest

in any decision as to whether to buy back the Series D shares prior to the Redemption Date and in what form to pay interest on the Notes.

(b)     Campbell, in his capacity as a member of the Board, participated (and continues to participate) in decision-making with respect to the Company's efforts (or lack thereof) to buy back Series D shares and the issuance of interest on the Notes.  Campbell thus faces a substantial likelihood of liability on the claims subject to a litigation demand.

94.     Defendant Parisi cannot reasonably be expected to respond to a demand in good faith because she is a Conflicted Insider who faces a substantial likelihood of liability due to her self-interested and conflicted decision-making with respect to the Company's failure to make a genuine effort to buy back Series D shares prior to the Redemption Date and payment of interest to Notes holders in the form of discounted Series D shares rather than cash.

(a)     As described above, Parisi's employer, Stilwell, stood to benefit from the redemption of Series D shares at a discount to the Conversion Price of the Notes and from the payment of discounted Series D shares as interest on the Notes, and thus Parisi had a disabling financial interest in any decision as to whether to buy back the Series D shares prior to the Redemption Date and in what form to pay interest on the Notes.

(b)     Parisi, in her capacity as a member of the Board, participated (and continues to participate) in decision-making regarding the Company's efforts (or lack thereof) to buy back Series D shares and the issuance of interest on the Notes.  Parisi thus faces a substantial likelihood of liability on the claims subject to a litigation demand.

95.     Moreover, as described above, the majority of the Demand Board were involved in the decision to remove Plaintiff as CEO in order to hinder the Company's efforts to buy back Series D shares and facilitate their own ability to acquire Notes in the Rights Offering and carry out a scheme to enrich themselves and assume control of the Company following the Redemption Date. The deterioration of the relationship between Plaintiff and the majority of the Demand Board suggests that the Demand Board could not make a good-faith determination concerning any demand by Plaintiff.

96.     Lastly, the majority of the Demand Board were also recipients of at least three letters from Plaintiff prior to the Redemption Date asserting that the decisions not to make any genuine effort to buy back Series D shares and to pay interest on the Notes in discounted Series D shares constitute breaches of the directors' fiduciary duties—the very same claims that would be subject to a litigation demand. In response, the majority of the Demand Board ignored these allegations, took no action to address the outstanding Series D shares prior to the Redemption Date, and on two separate occasions following receipt of the letters from Plaintiff, issued discounted Series D shares as interest on the Notes. The fact that the majority of the Demand Board were already presented with multiple opportunities to address the claims that would be subject to a litigation demand and failed to do so shows their extreme commitment to the decisions in dispute and further demonstrates the futility of a litigation demand.

97.     Based on the foregoing, there is a reasonable doubt that the majority of the Demand Board could properly exercise their business judgment in acting on any demand. Demand is therefore excused.

**Plaintiff's Direct Claims Are Properly Brought on Behalf of the Class**

98.     Plaintiff also brings this Action individually and on behalf of the Class comprised of all holders of Wheeler common stock who did not participate in the Rights Offering and were thus harmed by Defendants' actions described above.  Excluded from the Class are Defendants and any individual or entity related to, or affiliated with, any Defendant.

99.     This action is properly maintainable as a class action because:

(a)     The Class is so numerous that joinder of all members is impracticable.  The Company's 10-K for FY 2023 suggests that as of March 1, 2024, there were over 68 million shares of Wheeler common stock outstanding.  On information and belief, these shares were held by thousands of geographically disbursed holders.

(b)     There are questions of law and fact that are common to the Class and which predominate over questions affecting any individual Class member including, among others:

(i)     Whether the Individual Defendants breached their fiduciary duties owed to Plaintiff and the Class in connection with the Company's failure to buy back Series D shares prior to the Redemption Date and its issuance of discounted Series D shares as interest on the Notes, including their fiduciary duties to act in good faith, in a manner the directors reasonably believed to be in the best interests of the Company, and with the care that an ordinarily prudent person in a like position would use under similar circumstances, so as to benefit all of the Company's shareholders;

(ii)     Whether the Individual Defendants elevated their personal interests, and/or the interests of Stilwell, above the interests of the Company and its shareholders, and at the expense of Plaintiff and the Class;

(iii)     Whether the Individual Defendants, in bad faith and/or for improper reasons, prevented the Company from genuinely pursuing a reduction in its exposure to the redemption of Series D shares prior to the Redemption Date;

(iv)     Whether the Individual Defendants' decision-making regarding any tender offers for repurchase of the Series D shares and any interest payments on the Notes was improperly tainted by material conflicts of interest;

(v)     Whether the Stilwell Fund Defendants aided and abetted any of the Individual Defendants' breaches of fiduciary duties owed to Plaintiff and the Class in connection with the Series D shares and the Notes; and

(vi)     Whether Plaintiff and the Class were injured and/or damaged by Defendants' misconduct so as to entitle them to monetary relief.

(c)     Plaintiff does not have any interest that is adverse to the Class as his claims are typical of the claims of all Class members;

(d)     Plaintiff is an adequate representative of the Class who is committed to prosecuting this action and has retained competent counsel with extensive experience litigating actions of this nature; and

(e)     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications; establish incompatible standards of conduct for Defendants; and/or result in adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not party to those adjudications, thereby substantially impairing (or entirely impeding) their ability to protect their own interests.

100.     A class action is the superior method for the fair and efficient adjudication of this controversy.

101.     As Defendants have acted on grounds generally applicable to the Class with respect to the matters alleged herein, the damages sought in this action are recoverable by the Class as a whole.

### CLAIMS FOR RELIEF

### COUNT I
### BREACH OF FIDUCIARY DUTY
### (DIRECTLY AND DERIVATIVELY AGAINST THE INDIVIDUAL DEFENDANTS)

102.     Plaintiff hereby incorporates and realleges all the foregoing allegations as if fully set forth herein.

103.     Defendants Stilwell, Borrack, Poskon, Parisi, Campbell, Carter, Flemma, Bergman, and Pollack, as directors of Wheeler, owe fiduciary duties to Wheeler and its shareholders generally, and Plaintiff and the Class specifically, including their duties to act (i) in good faith, (ii) in a manner each reasonably believes to be in the best in the best interests of Wheeler, and (iii) with the care that an ordinarily prudent person in a like position would use under similar circumstances, so as to benefit all shareholders and not in furtherance of their personal interest or benefit.  Defendant Franklin, as an officer of Wheeler, similarly owes fiduciary duties to Wheeler and its shareholders generally, and to Plaintiff and the Class specifically, including duties of good faith, loyalty, and due care.

104.     The Individual Defendants breached their fiduciary duties owed to the Company and to Plaintiff and the Class as shareholders of the Company.

105.     The Individual Defendants failed to authorize the Company to make any genuine offers in 2022 or 2023 to repurchase Series D shares prior to the Redemption Date, despite the Company having adequate cash on hand and available assets to make such an offer to Series D

shareholders, including at least $7 million in cash that was instead invested in Defendant Stilwell Activist Investments, L.P., which resulted in the severe dilution and reduction in the price of Wheeler's common stock prior to and following the Redemption Date.

106.    The Individual Defendants authorized the Company to pay interest to Notes holders, including certain of the Individual Defendants, in discounted Series D shares in December 2021, June 2023, and December 2023, instead of available cash, which increased the Company's exposure to Series D redemptions prior to and following the Redemption Date and caused further dilution and reduction in the price of Wheeler's common stock.

107.    These decisions by the Individual Defendants were not taken in good faith, nor in a manner reasonably believed to be in the best interest of Wheeler or its shareholders, nor with the care an ordinarily prudent person in a like position would use under similar circumstances.

108.    As a result of the Individual Defendants' breaches of fiduciary duty as outlined herein, the Company, Plaintiff, and the other members of the Class have been damaged and will continue to suffer damages.

### COUNT II
### AIDING AND ABETTING THE INDIVIDUAL DEFENDANTS'S BREACHES OF FIDUCIARY DUTY
### (DIRECTLY AND DERIVATIVELY AGAINST THE STILWELL FUND DEFENDANTS)

109.    Plaintiff hereby incorporates and realleges all the foregoing allegations as if fully set forth herein.

110.    The Stilwell Fund Defendants are sued herein as aiders and abettors of the Individual Defendants' breaches of fiduciary duty as outlined above.

111.    The Individual Defendants' breaches of fiduciary duty could not, and would not, have occurred but for the conduct of the Stilwell Fund Defendants who, therefore, aided and abetted such breaches.

112.    Indeed, the Stilwell Fund Defendants obtained, and/or will obtain, both direct and indirect benefits from colluding in or aiding and abetting the Individual Defendants' breaches. Specifically, the Stilwell Fund Defendants benefited from being able to obtain Series D shares at a significant discount to their market value and by increasing their beneficial ownership and control of the Company via their purchase of Notes.

113.    The Stilwell Fund Defendants substantially participated in the known breaches of fiduciary duty committed by the Individual Defendants alleged herein.  Specifically, Defendant Stilwell—who owns and controls the Stilwell Fund Defendants—purchased Notes through the Stilwell Fund Defendants, issued discounted Series D shares to the Stilwell Fund Defendants, and expanded his ownership and control of the Company by virtue of the Stilwell Fund Defendants' ownership of those Notes and Series D shares.

114.    The Stilwell Fund Defendants knew that the failure to buy back Series D shares prior to the Redemption Date and to issue interest on the Notes in discounted Series D shares would harm the Company and its common stockholders but benefit Notes holders such as Defendant Stilwell.  Defendant Stilwell's knowledge should be imputed to the Stilwell Fund Defendants, which he owned, controlled, and used to carry out his breaches of fiduciary duty.

115.    As a result of the Stilwell Fund Defendants' conduct of aiding and abetting the Individual Defendant's breaches of fiduciary duties, the Company, Plaintiff, and the other Class members have been damaged and will continue to suffer damages.

## <u>COUNT III</u>
## UNJUST ENRICHMENT
## (DIRECTLY AND DERIVATIVELY AGAINST THE CONFLICTED INSIDERS AND STILWELL FUND DEFENDANTS)

116.    Plaintiff hereby incorporates and realleges all the foregoing allegations as if fully set forth herein.

117.    Through their wrongful course of conduct and actions, the Conflicted Insiders and Stilwell Fund Defendants were unjustly enriched at the expense of, and to the detriment of, Wheeler, Plaintiff, and the Class.  The wrongful conduct was continuous and resulted in ongoing harm to Wheeler, Plaintiff, and the Class.

118.    The Conflicted Insiders and Stilwell Fund Defendants were unjustly enriched in receiving discounted Series D shares as interest on their Notes while breaching their fiduciary duties to Wheeler, Plaintiff, and the Class, or aiding and abetting the same.

119.    The Conflicted Insiders and Stilwell Fund Defendants were unjustly enriched in receiving discounts on the Conversion Price of their Notes due to Series D shareholders tendering their shares following the Redemption Date as a direct result of their breaches of fiduciary duties to Wheeler, Plaintiff, and the Class, or aiding and abetting the same.

120.    Defendants Stilwell and Stilwell Activist Investments, L.P. were unjustly enriched in receiving at least $7 million in investments by the Company in lieu of buying back Series D shares prior to the Redemption Date while breaching their fiduciary duties to Wheeler, Plaintiff, and the Class, or aiding and abetting the same.

121.    The Conflicted Insiders and Stilwell Fund Defendants were aware of, and had knowledge of, the benefits being conferred upon them.

122.    The Conflicted Insiders and Stilwell Fund Defendants have accepted and retained the benefits.

123.    The Conflicted Insiders' and Stilwell Fund Defendants' acceptance and retention of these benefits makes it inequitable for them to retain these benefits without payment of their full value.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Declaring that this action is properly maintainable as a class action and appointing Plaintiff and his counsel to serve as class representatives and class counsel, respectively;

B.    Finding that the Individual Defendants breached their duties owed to the Company, Plaintiff, and the Class in connection with the Company's failure to repurchase Series D shares prior to the Redemption Date and issuance of discounted Series D shares as interest on the Notes;

C.    Finding that the Stilwell Fund Defendants aided and abetted the Individual Defendants' breaches of their fiduciary duties;

D.    Finding that the Conflicted Insiders and Stilwell Fund Defendants were unjustly enriched by their breaches of fiduciary duty or aiding and abetting the same;

D.    Directing Wheeler to rescind, whether at law or in equity, any discount to the Conversion Price of the Notes that has been triggered or will be triggered by the redemption of Series D shares;

E.    Awarding Plaintiff and the Class all appropriate money damages for the Individual Defendants' violations of applicable law, and the aiding and abetting of such violations by the Stilwell Fund Defendants;

F.    Awarding Wheeler the amount of rescissory damages it sustained as a result of the Individual Defendants' violations of applicable law, and the aiding and abetting of such violations by the Stilwell Fund Defendants;

G.      Issuing an injunction to prohibit any further violations of applicable law by the Individual Defendants and the Stilwell Fund Defendants, including, without limitation, authorizing the Company to pay interest on the Notes in discounted Series D shares;

H.      Awarding Plaintiff the costs and disbursements of this action including reasonable attorneys' and experts' fees; and

I.      Granting all such other and further relief as may be deemed just and proper by the trier of fact.

## DEMAND FOR JURY TRIAL

124.    Plaintiff and the Class demand a trial by jury as to all issues so triable.

Date: April 10, 2024

DANIEL KHOSHABA

/s/_____

Richard H. Ottinger (VSB No.: 38842)
Katherine M. Lennon (VSB No. 92358)
Woods Rogers Vandeventer Black PLC
101 W. Main Street, Suite 500
Norfolk, VA 23510
Phone:   757-446-8600
Richard.Ottinger@wrvblaw.com
Kate.Lennon@wrvblaw.com

ROLNICK KRAMER SADIGHI LLP
Marc Kramer (*pro hac vice forthcoming*)
Jeffrey Ritholtz (*pro hac vice forthcoming*)
1251 Avenue of the Americas
New York, NY 10020

*Counsel for Plaintiff and the Class*