UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

DANIEL KHOSHABA,

        Plaintiff,

v.                            Civil Action No. 2:24cv237

JOSEPH D. STILWELL, et al.,

        Defendants.

## OPINION AND ORDER

This matter is before the Court on two motions to dismiss.[1] The first motion, ECF No. 25, was filed collectively by Joseph D. Stilwell, E.J. Borrack, Kerry Campbell, Paula Poskon, Megan Parisi, Stefani Carter, Saverio Flemma, Michelle Bergman, Dennis Pollack, and M. Andrew Franklin (the "Individual Defendants"). The second motion, ECF No. 27, was filed collectively by Stilwell Value Partners VII, L.P., Stilwell Activist Fund, L.P., Stilwell Activist Investments, L.P., Stilwell Associates, L.P., and Stilwell Value LLC (the "Fund Defendants" or "Stilwell Fund Defendants"). Because the facts and legal questions are adequately presented in the motions and subsequent briefs, and oral argument would not aid in

---

[1] While the Individual Defendants formally submitted two separate motions to dismiss, ECF Nos. 23 & 24, they supported both motions through one consolidated brief, ECF No. 25. For ease of readability and analysis, the Court considers the Individual Defendants' motions as one consolidated argument for dismissal and addresses each argument as presented in ECF No. 25.

the decisional process, the Court finds that a hearing is unnecessary and thus declines the parties' joint request for oral argument.  ECF No. 39.  For the reasons stated below, the Individual Defendants' Motion to Dismiss is **GRANTED in part and DENIED in part,** ECF Nos. 23 & 24, and the Stilwell Fund Defendants' Motion to Dismiss is **GRANTED in part and DENIED in part.**  ECF No. 26.

## I. BACKGROUND

On April 10, 2024, Daniel Khoshaba ("Plaintiff") filed a Complaint against the Individual Defendants and the Stilwell Fund Defendants.  The Complaint was filed both derivatively on behalf of Wheeler Real Investment Trust, Inc. ("Wheeler" or "the Company") and directly on behalf of Plaintiff and a putative class of Wheeler common stockholders.[2]  ECF No. 1, at 1.  In his Complaint, Plaintiff challenges a series of business decisions and financial transactions made by members of Wheeler's Board of Directors (the "Board") and corporate management from approximately 2021-2024.  Id. at 2.  All Individual Defendants are past or current members of Wheeler's Board, with the exception of M. Andrew Franklin ("Franklin"), who is the current Chief Executive Officer ("CEO") of Wheeler.  Id. at 8.  The Stilwell Fund Defendants are investment

---

[2] All facts stated herein are drawn from Plaintiff's Complaint.  ECF No. 1. When considering a motion to dismiss, the Court assumes that the facts alleged in a complaint are true and draws all reasonable factual inferences in the nonmovant's favor.  Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999).  The facts recited herein are not to be considered factual findings for any purpose other than consideration of the pending motions to dismiss.  See Edwards v. Murphy-Brown, L.L.C., 760 F. Supp. 2d 607, 611 n.1 (E.D. Va. 2011).

funds allegedly owned and controlled by Joseph Stilwell ("Stilwell"), an Individual Defendant and current member of Wheeler's Board. Id. at 7. The Court sets forth relevant factual background below.

## A. Wheeler's Financial History

Established in 1999 and incorporated under Maryland law, Wheeler is a real estate investment trust that owns, leases, and operates commercial real estate, with a primary focus on grocery-anchored shopping centers. Id. at 9. Wheeler publicly trades on the NASDAQ Stock Market under the ticker "WHLR" and maintains its principal office in Virginia Beach, VA. Id.

From 2016-2018, Wheeler registered and issued over three million shares of its "Series D Preferred Stock" ("D Stock") through two separate offerings.[3] Id. at 9-10. Wheeler first registered and offered 1,600,000 shares of dividend-bearing D Stock in September of 2016.[4] Id. at 9. Under the D Stock offering terms, for eligible years in which D Stock dividends were not paid in full, the dividend rate cumulatively accrued subject to a maximum annual rate. Id. Wheeler had the ability to redeem these shares

---

[3] The Series D Preferred Shares have no stated maturity date nor general voting rights. ECF No. 1, at 10.

[4] By way of background, while both preferred stock and common stock represent ownership or "equity" in a company, preferred stockholders typically receive dividend payments before common stockholders and enjoy priority over common stockholders if a company files for bankruptcy and liquidates its assets. Stocks, United States Securities and Exchange Commission (2024), https://www.investor.gov/introduction- investing/investing- basics/investment-products/stocks#Kinds.

of D Stock (i.e. buy them back at the Company's discretion) on or after September 21, 2021, for $25 per share in cash — plus all accrued and unpaid dividends — until September 21, 2023 (the "Redemption Date"). Id. at 10. Critically, on or after the Redemption Date, the shareholder could cause Wheeler to redeem the holder's D Stock shares for $25 per share (plus accrued and unpaid dividends) in cash or shares of common stock. Id.

In January of 2018, Wheeler "issued an additional 1,552,392 [shares of D Stock] for a price of $16.50," a figure "well below" the $25 redemption price that D Stockholders would be able to trigger on or after the Redemption Date. Id. In December of 2018, Wheeler announced that it "would not pay its fourth quarter dividends for the [D Stock] shares." Such dividends have been suspended, and thus accruing, since December 2018. Id.

### B. Stilwell's Investment

Beginning in June of 2016, Stilwell and the Stilwell Fund Defendants made initial investments in Wheeler. Id. In Plaintiff's characterization, Stilwell is the principal and managing member of Stilwell Value LLC, an "activist hedge fund" (and Fund Defendant) that functions as the investment advisor to other investment funds that, together, comprise the "Stilwell Group." Id. at 7. After Stilwell and funds within the Stilwell Group made investments in Wheeler, they launched "proxy fights" to change the membership of Wheeler's Board of Directors, first

4

unsuccessfully in 2018, then successfully in 2019.[5]  Id. at 11-12.
In the course of these proxy fights, Stilwell expressed concerns
about Wheeler's issuance of D Stock, calling such issuances
"dilutive and therefore harmful to Wheeler common stockholders,"
and questioned why "the Board approved the issuance of additional
preferred debt [at] such a deep discount to face value."  Id. at
11.

Stilwell's victorious proxy fight in 2019 resulted in the
appointment of Stilwell and several of his nominees to Wheeler's
Board, including Individual Defendants Paula Poskon ("Poskon") and
Kerry Campbell ("Campbell").  Id.  In Plaintiff's telling, Stilwell
convinced stockholders to elect him and his nominees to the Board
by criticizing Wheeler's "poor capital allocation decisions,"
specifically the issuance of D Stock which, in Stilwell's view,
"expose[d] the common stockholders to great consequences in the
future."  Id. at 12.  These "great consequences," in Stilwell's
description, included the prospect of all "Series D holders
decid[ing] to redeem their . . . preferred shares."  Id.  Should
such redemption occur, Wheeler "would have to pay $90,015,900 in
cash or issue the common stock equivalent, thereby significantly
diluting existing common stockholders."  Id.  To address this

---

[5] A proxy fight is a campaign to solicit votes (or proxies) in opposition to
management, most commonly at a company's annual meeting.   Shareholder
activists often use proxy contests to change the composition of a company's
board of directors to influence business decisions in favor of the activist's
views.  See 2024 LEXIS Practical Guidance – Proxy Contests: Process Overview
and Strategy Considerations.

troubling eventuality, Stilwell recommended "selling underperforming properties to generate cash to buy back the [D Stock]." Id. Stilwell has now served as a Wheeler director since January of 2020. Id. at 7.

Following his successful campaign to join Wheeler's Board, in February of 2020 Stilwell and his fellow directors filled a Board vacancy by adding Plaintiff as a director. Id. On April 13, 2020, the Board appointed Plaintiff as CEO of Wheeler. Id. at 12. Under his leadership as CEO, Plaintiff reports that Wheeler implemented a strategy of buying back outstanding shares of D Stock to "prevent a crisis at the Redemption Date." Id. at 13. On July 5, 2021, Plaintiff resigned as CEO and withdrew from consideration for reelection to the Board. Id. From Plaintiff's perspective, Stilwell and his allies on the Board "pushed [him] to resign as CEO" to "expand their control over the Company" through the establishment of a "Stilwell-majority Board." Id. Indeed, Plaintiff asserts that Stilwell and the Board members whose nominations Stilwell supported now viewed "the [D Stock] as an opportunity to enrich themselves" and were thus "[u]nsatisfied with Plaintiff's judicious approach to handling the Company's capital." Id.

### C. The Rights Offering

On July 22, 2021 — approximately two weeks after Plaintiff's resignation as CEO — Wheeler published a press release announcing

6

a "Rights Offering" designed to raise capital. Id. at 14. Under the terms of the Rights Offering, each of Wheeler's common stockholders became eligible to purchase senior subordinated convertible notes (the "Notes"), a form of debt security that was convertible at the holder's option to shares of Wheeler's common stock, ordinarily at a price of $6.25 per share of common stock (the "Conversion Price"). Id. at 2-3; see 7 Tenn. Juris. Corporations § 18 (2024).[6]

Importantly, on or following the Redemption Date, if at least 100,000 shares of D Stock were redeemed for common stock, the conversion rate for the Notes to common stock would be discounted below the Conversion Price to the lesser of two options: (1) 45 percent below the original Conversion Price; or (2) 45 percent below the lowest price at which a D Stockholder had converted his D Stock shares to common stock. Id. at 14. Adding a final term to the Rights Offering, if the Offering was not fully subscribed, common stockholders who had otherwise fully exercised their rights would be permitted to also exercise an "over-subscription privilege" to purchase additional, unsubscribed Notes at the same

---

[6] To further explain the terms of the Rights Offering, each common stockholder received one "right" for every eight shares of common stock they owned; one right, in turn, conferred on the stockholder the ability "to purchase $25 principal amount of Notes." Id. at 2. The Notes bear interest at a rate of seven percent annually, which would be paid by Wheeler twice per year in either cash, discounted Series B Preferred Stock, or discounted D Stock. Id. at 14. Interest paid in either Series B Preferred Stock or D Stock would be substantially discounted from the respective securities' 15-day average closing prices on the open market. Id.

price.  Id.  The Rights Offering was set to expire on August 13, 2021.

In explaining the primary purpose behind the Board's approval of the Rights Offering, Plaintiff cites the Rights Offering Prospectus (the "Prospectus") filed with the Securities and Exchange Commission (the "SEC"), and highlights language suggesting that the Offering was intended "to raise sufficient capital to fund future repurchases of . . . [D] Stock."  Id. at 14.  To that end, the Prospectus acknowledges that "there is a significant risk that [Wheeler] will not have sufficient cash to pay the aggregate redemption price, and would not be able to meet our redemption obligation without liquidating assets and/or substantial dilution of our Common Stock."  Id. at 15.  Plaintiff thus observes that the Board and management "plainly understood the gravity of the potential consequences should the Company fail to reduce the amount of outstanding [D Stock] before the Redemption Date."  Id.

### D. The Challenged Decisions & Transactions

After the Rights Offering closed on August 13, 2021, Plaintiff alleges that Individual Defendants Stilwell, Borrack, Campbell, Poskon, Parisi and Franklin (who was appointed CEO following Plaintiff's resignation) had collectively purchased over 90 percent of the available Notes.  Id.  Plaintiff refers to these Individual Defendants as the "Conflicted Insiders."  Id. at 8.  Importantly, Plaintiff claims that Stilwell purchased the vast majority of these

Notes personally or through the Stilwell Fund Defendants. Id. at 15. Indeed, by Plaintiff's calculation, Stilwell and the Fund Defendants purchased 999,995 Notes for nearly $25 million. Id. Poskon is alleged to have purchased 6,275 Notes for $156,875 (comprising half of her portfolio of Wheeler holdings), while Defendant Campbell allegedly purchased 4,000 Notes for $100,000 (which represented the entirety of Campbell's stock ownership in Wheeler), and Defendant Franklin supposedly purchased 1,069 Notes for $26,725, which represented "nearly all" of Franklin's holdings in Wheeler. Id. at 15-16.

Given the Board members' Notes ownership, Plaintiff contends that the foregoing directors (and the CEO, Franklin) were improperly incentivized to maximize the value of the Notes, "no matter the effect on the common stock price." Id. at 16. To that end, Plaintiff alleges that the so-called "Conflicted Insiders" preserved the amount of outstanding shares of D stock in order to benefit from the Notes' discounted conversion rate that would be triggered by the eventual redemption of 100,000 D Stock shares. Id. at 16. Plaintiff adds that these director defendants (and CEO Franklin) recognized that the preceding course of action would undermine the original purpose of the Rights Offering — to raise money to buy back outstanding shares of D Stock to reduce the redemption risk posed by such outstanding shares. Id.

### E. Wheeler Pays Interest on Notes in D Stock and Plaintiff Publishes Critical Letters

In December of 2021, the Board elected to pay interest on all the Notes through the further issuance of D stock, thereby increasing the outstanding shares of D stock and the potential redemption exposure by over $2,842,725.  Id. at 17.  Responding to this interest payment decision in late 2021, Plaintiff submitted multiple public letters to Wheeler's Board criticizing the directors for "forcing [him] out as CEO" and "act[ing] in their own self-interest and contrary to the best interests of the Company in breach of their fiduciary duties."  Id.  The Board acknowledged Plaintiff's public letters in a brief missive, writing that the directors were "saddened by [Plaintiff's] recent public letters," before adding that "while [Plaintiff's] short 16-month tenure as CEO had its pluses and minuses, we respected your written decision to resign for personal reasons when confronted with some of these minuses."  Id.

Two months later, on February 28, 2022, Wheeler filed its Form 10-K annual report (with the SEC) for fiscal year 2021, acknowledging that "there is a significant risk that the Company will not have sufficient cash to pay the aggregate redemption price, and would not be able to meet its redemption obligation without substantial dilution of its common stock."  Id. at 18.  In June of 2022, the Board elected to pay interest on the Notes in discounted Series B preferred shares, rather than D Stock.  Id.

10

Five months later, in November of 2022, Wheeler attempted to buy back shares of D stock prior to the looming Redemption Date through an "Exchange Offer." Id. at 19. In Plaintiff's appraisal, this Exchange Offer had "little appeal" to the D Stockholders because it asked them to accept reduced interest and "sacrifice roughly $9 in value" for each share of D Stock they held. Id. The Exchange Offer produced the valid tender of only 26.8 percent of the outstanding D Stock shares — less than the minimum number of shares necessary to effectuate the Exchange Offer — and therefore failed, leaving all shares of D stock outstanding. Id. at 19. Lamenting the unsuccessful Exchange Offer, Plaintiff insists that "there was no business justification for failing to buy back all or nearly all Series D shares with the Redemption Date fast approaching." Id. at 20.   Indeed, Plaintiff maintains that the failure to do so is attributable to select Individual Defendants' personal financial interests in "preserving the amount of outstanding preferred stock so that they could profit from the discounted conversion rates on their Notes after the Redemption Date." Id. at 19.   The next month, in December of 2022, the Board again elected to pay interest on the Notes in discounted Series B shares, a decision that Plaintiff does not challenge. Id. at 18.

At odds with Plaintiff's recommendation for Wheeler's capital management, the Company stated in its Form 10-K that it "does not believe it is in its interests to liquidate assets or incur

indebtedness to fund cash redemptions of the Series D Preferred Stock," while also acknowledging that the aggregate liquidation value could reach $119.80 million on the Redemption Date. Id. at 21. On April 11, 2023, Plaintiff submitted another letter to the Board, admonishing the directors that further issuances of discounted D Stock would be both "substantially dilutive . . . [and] contrary to the Board's fiduciary duties." Id. at 21. The Board responded through a letter from outside counsel, which acknowledged that "the Company continues to be afflicted by a capital structure problem" that it has tried to address through "two separate . . . tender offers and an Exchange Offer" that were not successful. ECF No. 25-4, at 2.[7]

On May 11, 2023, Plaintiff penned another public letter to the Board, urging both the Board and management to, among other things, "immediately begin negotiating a settlement with the holders of the Company's Series D preferred stock" and "stop issuing deeply discounted preferred securities in lieu of cash interest payments" on the Notes. Id. at 21. Plaintiff's letter continued, asserting that the strategy to pay interest on the Notes

---

[7] While a 12(b)(6) motion focuses on the allegations of the complaint, it is well established that a document attached to a motion to dismiss may be considered when evaluating a motion to dismiss if the document was "integral to the complaint and authentic." Sec'y of State For Defence v. Trimble Nav. Ltd., 484 F.3d 700, 705 (4th Cir. 2007). Here, the response from outside counsel is integral (and its authenticity is unchallenged) as such response provides context for the subsequent analysis as to whether Plaintiff satisfied the prerequisites for bringing the instant derivative suit. Fed. R. Civ. P. 23.1.

in discounted D Stock shares was "for the benefit of essentially one director" because it "dilutes stockholders, while allowing Mr. Stilwell to be the primary beneficiary" as "the beneficial owner of over 80%" of the Notes.  Id. at 22.

On May 19, 2023, eight days after receiving Plaintiff's letter, Wheeler's Board and management decided to again pay interest on the Notes in D Stock, increasing the number of outstanding D Stock shares as the Redemption Date approached.  Id. at 22.  Separately, on June 1, 2023, the Board invested $3.5 million for "limited partnership interests" in Stilwell Activist Investments, L.P., one of the Fund Defendants that is allegedly owned and controlled by Stilwell.  Id. at 23.  Plaintiff maintains that this investment "explicitly enriched Stilwell and his fund with cash that should have been used to reduce the outstanding Series D shares."  Id.

On June 12, 2023, Plaintiff sent another public letter to the Board, writing that directors should "stop disregarding stockholders' interests and making self-interested decisions that appear to insulate themselves from the Company's performance."  Id. To that end, Plaintiff questioned "who is Mr. Campbell running the Company for - the common stockholders or the noteholders?"  Id. Plaintiff concluded with an exhortation: "the Company is now in crisis. Urgent action by the Board and management is necessary." Id.

On August 8, 2023, Wheeler filed its Form 10-Q for the second fiscal quarter of 2023. Id. at 24. In this public report, the Board and management again noted that "the Company does not believe it is in its interests to liquidate assets or incur indebtedness to fund cash redemptions of the Series D Preferred Stock." Id. Instead, the report explained, "the Company intends to settle redemptions of Series D Preferred following the Series D Redemption Date in Common Stock," acknowledging that such course of action "will result in a substantial dilution of the outstanding Common Stock." Id.

Throughout 2023, Wheeler's stock price had materially declined, a downward trajectory that Plaintiff attributes to the "impending dilutive event" recognized in the foregoing Form 10-Q. Id. By May of 2023, Wheeler's stock price had fallen below NASDAQ's minimum bid price of $1.00. To address the deterioration of its stock price, on August 17, 2023, the Board authorized a 1 for 10 reverse stock split of shares of common stock.[8] Id. This stock split reduced the conversion rate of Notes to common stock but did not eliminate the Notes' conversion discount that would be triggered by the redemption of 100,000 shares of D Stock. Id.

---

[8] A reverse stock split refers to a corporation's reduction in the number of shares outstanding by calling in all shares and issuing a smaller number while the overall corporate capital remains the same. The effect of a reverse stock split is to increase the value of each share while proportionally reducing the number of shares. See, e.g., FGS Enterprises, Inc. v. Shimala, 625 N.E.2d 1226, 1227 n.2 (Ind. 1993); see also Black's Law Dictionary 1320 (6th ed. 1990).

Therefore, in Plaintiff's calculation, one important consequence of this stock split was that the Notes could become more valuable through common stock conversion after the Redemption Date. Id.

On September 1, 2023, two Individual Defendants and Board members — Kerry Campbell and Stefani Carter, now acting in their capacity as members of a "Related Person Transactions Committee" — allegedly authorized Wheeler to make a second $3.5 million investment for limited partnership interests in Fund Defendant Stilwell Activist Investments, L.P. Id. at 25.

### F. D Stock Redemptions Begin

Meanwhile, one month before the impending redemption in September 2023, Wheeler issued over 100 million shares of common stock at $0.01 par value per share to account for expected D Stock redemption, announcing that such redemptions would be processed monthly beginning in October. Id. In this first month of redemptions alone, Wheeler issued over two million shares of common stock to eligible D Stock shareholders, resulting in an aggregate redemption price of approximately $6.46 million. Id. Because 100,000+ D Stock shares had been redeemed, the redemptions triggered the discount on the conversion price from Notes to common stock, which, in Plaintiff's estimation, "more than doubled" Stilwell's beneficial ownership of the Company to 83.7 percent of Wheeler's common stock by October 20, 2023. Id. at 26. The putative class of common stockholders (who did not participate in

the Rights Offering) "suffered severe dilution," Plaintiff observes. Id.

In November of 2023, the second month of redemptions, the Company was "forced" to issue over 14 million shares of common stock to settle the aggregate redemption price of approximately $12 million, driving down the common stock price while the Notes continued to enjoy dramatically improved common stock conversion rates under the terms of the Rights Offering. Id. As a result, the Noteholders who elected to convert their Notes to common stock amassed greater ownership of the Company. Id.

On November 15, 2023, one day after Wheeler announced that it may not have sufficient common stock to cover continued redemption requests, the Board again issued discounted shares of D Stock as interest payment to Noteholders, further increasing the amount of D Stock shares eligible for immediate redemption. Id. In response to the challenges posed by the Company's shifting capital structure, on December 5, 2023, Wheeler entered into an agreement with Stilwell and the Stilwell Fund Defendants to create a "Capital Stock Excepted Holder Limit" (the "Stilwell Agreement"). Id. at 27. In summary, the Stilwell Agreement significantly increased the pre-existing aggregate stock ownership limit, thereby authorizing Stilwell's majority ownership of the Company in exchange for a short-term, one-year agreement by Stilwell and the

16

Fund Defendants not to convert their Notes into shares of common stock beyond a set limit.  Id. at 27-28.

Over the course of the next four months, D Stock redemptions continued, and the common stock price continued to decline, while the Notes' common stock conversion rates grew significantly more attractive.  Id.  By April of 2024, Wheeler's common stock was trading at $0.14 per share, which, by Plaintiff's calculation, represents a decline in value of over 99 percent in under three years.  Id. at 5.  Indeed, Plaintiff reports that his common stock ownership dwindled from over 11 percent to 1.2 percent or less of outstanding shares.  Id. at 6.  Conversely, Stilwell managed to "parlay his Notes into an effective 80-plus percent ownership stake" in Wheeler.  Id.  Wheeler is still "far from paying off all of the Series D shareholders," and will be "unable to do so without further diluting the common stock."  Id.

Against this backdrop of shifting capital structures and ownership interests, on April 10, 2024, Plaintiff filed a three count Complaint in this Court against both the Individual Defendants and Fund Defendants.  Count I alleges breach of fiduciary duty directly and derivatively against the Individual Defendants; Count II alleges, directly and derivatively against the Stilwell Fund Defendants, aiding and abetting the Individual Defendants' breaches of fiduciary duty; and Count III alleges Unjust Enrichment both directly and derivatively against the so-

called Conflicted Insiders (certain Individual Defendants) and the Stilwell Fund Defendants. Id. at 40. Plaintiff seeks damages personally, on behalf of the putative shareholder class, and on behalf of Wheeler. Id. at 41-42. Plaintiff also seeks equitable relief, namely an injunction prohibiting further interest payment on the Notes in discounted D Stock shares. Id.

On June 10, 2024, both the Individual Defendants and Fund Defendants filed separate, though interrelated, motions to dismiss Plaintiff's Complaint. ECF Nos. 23, 24, 26. In addition to seeking dismissal of all counts under Rule 12(b)(6) for failure to state a claim, both sets of defendants seek dismissal under Rule 23.1 for failure to satisfy the prerequisites to bringing a derivative claim, and the Fund Defendants advance a challenge to this Court's personal jurisdiction under Rule 12(b)(2). ECF No. 27, at 15; Fed. R. Civ. P. 12(b)(6); Fed. R. Civ. P. 12(b)(2); Fed. R. Civ. P. 23.1. After receiving a briefing extension, on July 25, 2024, Plaintiff filed a consolidated response in opposition to the motions to dismiss. ECF No. 32. On August 15, 2024, both the Individual and Fund Defendants filed separate reply briefs in support of their respective motions to dismiss. ECF Nos. 37, 38. The matter is thus fully briefed and ripe for disposition.

## II. LEGAL STANDARD

### A. Personal Jurisdiction - Rule 12(b)(2)

Rule 12(b)(2) of the Federal Rules of Civil Procedure permits an action to be dismissed for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). When resolving a Rule 12(b)(2) motion, a district court undertakes a two-step analysis. First, a reviewing court looks to whether personal jurisdiction is authorized by state law. Mitrano v. Hawes, 377 F.3d 402, 406 (4th Cir. 2004). If personal jurisdiction is authorized, then the district court determines whether the exercise of personal jurisdiction comports with the constitutional requirements of due process. Id. Because Virginia's "long-arm" statute extends personal jurisdiction to the constitutionally permissible limits of the Due Process Clause of the Fourteenth Amendment, the "statutory inquiry merges with the constitutional inquiry." Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 277 (4th Cir. 2009).

Controlling this inquiry, the Due Process Clause requires "'minimum contacts' with the forum so that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" Hawkins v. i-TV Digitalis Tavkozlesi zrt., 935 F.3d 211, 228 (4th Cir. 2019) (quoting International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). The nature and frequency of the forum-state contacts required to establish "minimum contacts" depends on whether the case involves the exercise of

"specific" or "general" jurisdiction.  Fidrych v. Marriott Int'l, Inc., 952 F.3d 124, 131 (4th Cir. 2020).  General jurisdiction permits the reviewing court to hear any and all claims against the defendant; therefore, to exercise general jurisdiction, a defendant must have contacts with the forum jurisdiction that are "so constant and pervasive as to render it essentially at home in the forum State."  Daimler AG v. Bauman, 571 U.S. 117, 122 (2014) (quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011)).  If the defendant does not have sufficient contacts to be "at home" in the forum, the district court may exercise specific jurisdiction if the defendant has "purposefully established minimum contacts in the forum State" such that the defendant "should reasonably anticipate being haled into court there."  Perdue Foods LLC v. BRF S.A., 814 F.3d 185, 188-89 (4th Cir. 2016).  This "minimum contacts" analysis is "not mechanical," and a reviewing court must weigh "the totality of the facts" before it.  Id. (quoting Universal Leather, LLC v. Koro AR, S.A., 773 F.3d 553, 561 (4th Cir. 2014)).  To determine whether specific jurisdiction lies in the forum state, a district court considers "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable."  Id.  (quoting ALS Scan,

Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002)). The plaintiff must prevail on each prong. Consulting Eng'rs, 561 F.3d at 278.

Incorporating these background legal principles, when a district court reviews a pretrial challenge to personal jurisdiction without conducting an evidentiary hearing, as here, the plaintiff "need only make a prima facie showing of personal jurisdiction." Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc., 334 F.3d 390, 396 (4th Cir. 2003) (citing Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989)). In considering whether a plaintiff has made the requisite showing, reviewing courts must construe all relevant pleading allegations "in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." Brooks v. Motsenbocker Advanced Devs., Inc., 242 F. App'x 889, 890 (4th Cir. 2007) (citing Combs, 886 F.2d at 676).

If the plaintiff has made a prima facie showing, the defendant must "present a compelling case that the presence of some other considerations would render jurisdiction [so] unreasonable" as to "offend traditional notions of fair play and substantial justice." Medmarc Cas. Ins. Co. v. GD Grp. USA Co., 669 F. Supp. 3d 555, 560-61 (E.D. Va. 2023) (citing Int'l Shoe, 326 U.S. at 316); Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985). When analyzing the parties' respective burdens, a district court may rely on

"motion papers, supporting legal memoranda, [and] the allegations in the complaint." Consulting Eng'rs, 561 F.3d at 276; see 5B Alan Wright & Arthur Miller, Fed. P. & Proc. § 1351, at 305 (3d ed. 2004).

## B. Failure to State a Claim – Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a cause of action based on the plaintiff's failure to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A motion to dismiss pursuant to Rule 12(b)(6) must be read in conjunction with Federal Rule of Civil Procedure 8(a)(2), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief" so as to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Fair notice is provided by setting forth enough facts to "raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. at 555, 570.

To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). The "plausibility standard is not akin to a

22

'probability requirement,' but it asks for more than a sheer possibility" that a defendant is liable.   Id. (quoting Twombly, 550 U.S. at 556).   Moreover, neither "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," nor "unadorned, the-defendant-unlawfully-harmed-me accusation[s]" suffice to meet the plausibility requirement.   Id. (citing Twombly, 550 U.S. at 555).

Because a motion to dismiss tests the sufficiency of a complaint without resolving factual disputes, a district court "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'"   Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., Md., 684 F.3d 462, 467 (4th Cir. 2012) (quoting E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 440 (4th Cir. 2011)).   Although the truth of the well-pled facts is presumed, district courts are not bound by the "legal conclusions drawn from the facts" and "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments."   E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship, 213 F.3d 175, 180 (4th Cir. 2000).

### C. Derivative Action Requirements – Rule 23.1

Rule 23.1 of the Federal Rules of Civil Procedure applies when "one or more shareholders or members of a corporation" bring a "derivative action to enforce a right that the corporation . . . may properly assert but has failed to enforce."   Fed. R. Civ. P.

23.1(a).  Rule 23.1 provides, among other requirements, that the "complaint must be verified and must . . . state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort."  Fed. R. Civ. P. 23.1(b)(3).

### III. DISCUSSION

In their respective motions, the Individual and Fund Defendants advance numerous grounds for dismissal.  Because federal courts generally must first resolve questions of jurisdiction before addressing the merits of a case, the Court first addresses the Stilwell Fund Defendants' challenge to personal jurisdiction. Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 430-31 (2007) (citing Steel Co. v. Citizens for Better Environment, 523 U.S. 83, 93-102 (1998)).

### A. Personal Jurisdiction over the Stilwell Fund Defendants

The Stilwell Fund Defendants seek dismissal of the Complaint under Rule 12(b)(2), arguing that Plaintiff cannot establish that the Fund Defendants have sufficient contacts with Virginia to subject them to personal jurisdiction in the state.  ECF No. 27, at 15.  The parties appear to agree that general jurisdiction is not present, so the dispute centers on whether Plaintiff has made a prima facie showing of specific jurisdiction over the Stilwell

Fund Defendants to survive the jurisdictional challenge. Carefirst, 334 F.3d at 396.

As previously explained, for a district court to exercise specific personal jurisdiction, the defendant must have "purposefully established minimum contacts in the forum State such that it should reasonably anticipate being haled into court there." Perdue Foods, 814 F.3d at 189. When analyzing a defendant's contacts with the forum state, a reviewing court considers "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." Id. (internal citations omitted). The plaintiff must prevail on each prong to demonstrate that jurisdiction is proper. Id.

Applying this tripartite test, the Court first considers the extent to which the Stilwell Fund Defendants have purposefully availed themselves of the privilege of conducting activities in Virginia. While the "purposeful availment" requirement is not "susceptible of mechanical application," Consulting Eng'rs, 561 F.3d at 278, district courts addressing a business-related suit consider the following factors: (1) "whether the defendant maintains offices or agents in the forum state;" (2) "whether the defendant owns property in the forum state;" (3) "whether the

defendant reached into the forum state to solicit or initiate business;" (4) "whether the defendant deliberately engaged in significant or long-term business activities in the forum state;" (5) "whether the parties contractually agreed that the law of the forum state would govern disputes;" (6) "whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship;" (7) "the nature, quality and extent of the parties' communications about the business being transacted;" and (8) "whether the performance of contractual duties was to occur within the forum." Id. (internal citations omitted).

Considering the first factor (maintaining offices), while the Stilwell Fund Defendants do not maintain offices in Virginia, Plaintiff alleges that the Stilwell Fund Defendants are all controlled and managed by Stilwell. ECF No. 1, at 2. In his capacity as a Wheeler director, Stilwell routinely attends Wheeler board meetings in Virginia Beach, VA, Wheeler's principal place of business. Id. However, neither Stilwell nor the Stilwell Fund Defendants are based in Virginia, and Plaintiff does not allege that Stilwell should be considered an "agent" of the Stilwell Fund Defendants in this context, so this first factor modestly counsels against finding purposeful availment. Addressing the second factor (property ownership), it is undisputed that the Stilwell Fund Defendants do not own physical property in Virginia, which has historically been the focus of reviewing courts addressing this

factor.  See Base Metal Trading, Ltd. v. OJSC, 283 F.3d 208, 213 (4th Cir. 2002).  However, the Stilwell Fund Defendants are alleged (with Stilwell personally) to own over 80% of Wheeler's common stock (ECF No. 1, at 26-27), and Wheeler is headquartered in Virginia while incorporated in Maryland.  See Lee Graham Shopping Ctr. v. Kirsch, No. 1:13cv189, 2013 WL 12097824, at *1 (E.D. Va. May 2, 2013) (finding personal jurisdiction where the defendant did not own physical property in Virginia but claimed an ownership interest in a Virginia LLC, and observing that the "act of claiming an ownership interest in a closely-held Virginia business satisfies this Court that it may exercise personal jurisdiction over the entities").  This second factor thus lightly counsels in favor of finding personal jurisdiction.

As to the third factor (soliciting business), Plaintiff alleges that the Stilwell Fund Defendants invested in Wheeler and then engaged in a year-long proxy fight over the composition of Wheeler's Board to appoint their own directors, implement their own financial plans, and ultimately profit on their investment. ECF No. 1, at 2-7.  Indeed, the Fund Defendants are alleged to have purchased the majority of the available Notes (for nearly $25 million), ultimately amassing a majority ownership stake Wheeler, a company with its principal place of business in Virginia.  Id. at 15.  These facts are plainly indicative of the Stilwell Fund Defendants' initiation of business in Virginia (through their

extensive engagement with and investment in a company with its principal place of business in Virginia), and counsel in favor of finding minimum contacts as Plaintiff has made a showing that the Fund Defendants' Wheeler transactions form the basis of this suit. Id. at 37-41; see Universal Leather, 773 F.3d at 562-63 (noting that a corporate defendant's business meetings and ongoing business dealings with the plaintiff counseled in favor of finding that the plaintiff had made a prima facie showing of personal jurisdiction in the state where the plaintiff was headquartered).

Reviewing the fourth factor (business activities), it is evident that the Stilwell-controlled Fund Defendants have deliberately engaged in significant or long-term business activities with respect to the Virginia-headquartered Wheeler. As noted, over the span of five years, Stilwell and the Stilwell Fund Defendants allegedly accumulated a predominant ownership stake in Wheeler, won numerous seats on the board of directors, and have implemented various financial plans for the Company's capital structure, not to mention the allegation that one Stilwell Fund Defendant received two multi-million-dollar investments from Wheeler. Id. at 24-25; see Alterseekers, Inc. v. BrandForce SF, LLC, No. CV 12-5392, 2015 WL 5719759, at *5-7 (E.D.N.Y. Sept. 29, 2015) (observing that personal jurisdiction is appropriately extended to a corporation without any contacts with the forum state when the corporation is sufficiently alleged to be "so dominated

by an individual" who is subject to personal jurisdiction in the forum state); *see also* Loc. 875 I.B.T. Pension Fund v. Pollack, 992 F. Supp. 545, 557 (E.D.N.Y. 1998) (concluding that the plaintiffs had made a prima facie showing of personal jurisdiction over a foreign investment firm in part because personal jurisdiction existed over the individual manager of the investment firm).  This fourth factor thus counsels in favor of finding minimum contacts.[9]  *Id.* at 37-41.  And after considering the remaining four factors and drawing the "most favorable inferences for the existence of jurisdiction," Brooks, 242 F. App'x at 890, the Court finds that the Stilwell Fund Defendants have purposefully availed themselves of the privilege of conducting activities in Virginia through establishing sufficient contacts with the state.[10]

---

[9] The Court has weighed the fifth factor (governing law) and recognizes that the investment agreement between Wheeler and one of the Stilwell Fund Defendants did not select Virginia law to govern disputes.  Considering the sixth factor (in-person contacts) and drawing reasonable inferences in favor of jurisdiction, Stilwell, allegedly the controlling manager of the Stilwell Fund Defendants, has routinely made in-person contact with Wheeler in Virgina regarding his investment in Wheeler, through, among other activities, attending Wheeler board meetings.  Regarding the seventh factor (communication), when drawing the most favorable inferences for the existence of jurisdiction, the Court may infer that there has been communication between the Stilwell Fund Defendants and Wheeler regarding the Stilwell Fund Defendants' purchase of Wheeler's debt and equity and their receipt of an investment from Virginia-headquartered Wheeler.  Brooks, 242 F. App'x at 890.  The final factor (location of performance of contractual duties) also cuts in favor of finding purposeful availment as the Stilwell Fund Defendants concede that the agreement governing Wheeler's investment in one of their funds "contemplate[s] some performance in Virginia."  ECF No. 27, at 21.

[10] Seeking personal jurisdiction-based dismissal, the Stilwell Fund Defendants cite Shaffer v. Heitner, 433 U.S. 186, 216 (1977) for the proposition that "merely purchasing an ownership interest in a company incorporated in the forum state is insufficient to confer personal jurisdiction over a nonresident."  ECF No. 27.  In Shaffer, the Supreme Court observed that it "strains reason . . . to suggest that anyone buying

The Court next addresses the second requirement to exercise specific personal jurisdiction — whether Plaintiff's claims arise out of the Stilwell Fund Defendants' activities directed at Virginia. Plaintiff's claims against the Stilwell Fund Defendants can be summarized as follows. Count II alleges that as entities controlled and managed by Stilwell, the Stilwell Fund Defendants aided and abetted the Board and management's breach of fiduciary duties by purchasing substantial amounts of Wheeler's Notes and receiving shares of D Stock, thereby facilitating the increase in Stilwell's ownership of Wheeler at the expense of some common stockholders. ECF No. 1, at 39. Count III alleges that the Stilwell Fund Defendants were unjustly enriched by their receipt of discounted shares of D Stock, discounts on the Notes' common stock conversion price, and "at least $7 million in investments" by Wheeler. Id. at 40.

---

securities in a corporation formed in Delaware 'impliedly consents' to subject himself to Delaware's . . . jurisdiction on any cause of action." Shaffer, 433 U.S. at 216 (emphasis added). There, the appellants had "nothing to do with the State of Delaware" besides accepting a directorship in a company incorporated in Delaware, and the Plaintiff did not allege "any act related to his cause of action as having taken place in Delaware." Id. at 213. By contrast, the Stilwell Fund Defendants are alleged to have robustly engaged with the Virginia-headquartered Wheeler by amassing a predominant ownership stake in the Company, engaging (by way of Stilwell) in a sustained proxy fight to change the composition of Wheeler's board, and accepting a multi-million-dollar investment from Wheeler, memorialized in an investment agreement which, the Fund Defendants concede, "contemplate[s] some performance in Virginia." ECF No. 27, at 21. Additionally, as discussed further below, the Stilwell Fund Defendants' preceding engagement with Wheeler does form the basis of Plaintiff's suit.

Each of the preceding claims arises out of the Stilwell Fund Defendants' activities directed at Virginia because, drawing the most favorable inferences for the existence of jurisdiction, their investments in Wheeler facilitated the Individual Defendants' alleged breaches of fiduciary duty.  The Stilwell Fund Defendants, through their Notes ownership, received the D Stock-based interest payments, one of the core decisions that Plaintiff challenges in his breach of fiduciary duty claim.  Brooks, 242 F. App'x at 890; Id. at 38-39.  The Individual Defendants plausibly engaged in the alleged breaches in Virginia, where Wheeler has its principal place of business and where its Board presumably convenes.  Additionally, as the Stilwell Fund Defendants acknowledge, they did to some extent solicit a multi-million-dollar investment from the Virginia-headquartered Wheeler by sending marketing materials to the Company and entering into an investment agreement that contemplates some performance in Virginia.  ECF No. 1, at 40.  Indeed, this latter transaction serves as the partial factual predicate for Plaintiff's third count alleging unjust enrichment.  ECF No. 1, at 40. Therefore, when viewed in the light most favorable to Plaintiff, the foregoing claims arise out of the Stilwell Fund Defendants' activities directed at the Virginia-headquartered Wheeler.  Brooks, 242 F. App'x at 890.

In addressing the third requirement for the exercise of specific personal jurisdiction — whether exercising personal

jurisdiction would be constitutionally reasonable — the Court considers the following factors: (1) the burden on the Stilwell Fund Defendants of litigating in Virginia; (2) Virginia's interest in adjudicating the instant dispute; (3) Plaintiff's interest in obtaining convenient and effective relief from this Court; (4) the shared interest of the states in obtaining efficient resolution of disputes; and (5) the interests of the states in furthering substantive social policies. Consulting Eng'rs, 561 F.3d at 279 (citing Burger King, 471 U.S. at 477).

Considering these factors, the Stilwell Fund Defendants acknowledge that the burden of litigating in Virginia is "concededly small," and thus the first factor counsels in favor of finding jurisdiction reasonable. ECF No. 27, at 24. Addressing the second factor, Virginia has a legitimate interest in adjudicating disputes arising out of the corporate activities of a publicly traded company headquartered in Virginia. See Carfax, Inc. v. Accu-Trade, LLC, No. 1:21cv361, 2022 WL 657976, at *9 (E.D. Va. March 4, 2022) (finding that Virginia had a legitimate interest in adjudicating the dispute in part because the company at issue was "headquartered and principally operating in Virginia"). Considering the third factor, Plaintiff does have an interest in obtaining relief from this Court — which is, of course, located near Wheeler's principal place of business — to prevent the filing of a separate suit against the Stilwell Fund Defendants that could

32

produce a judgment inconsistent with this Court's disposition of the interrelated allegations against the Individual Defendants who have not contested this Court's personal jurisdiction. <u>See</u> <u>Mussetter Distrib., Inc. v. DBI Beverage Inc.</u>, Civ. No. 09-1442, 2009 WL 1992356, at *5 (E.D. Cal. July 8, 2009) ("Ultimately, the adjudication of th[e] common questions in a single forum will promote judicial economy, conserve the parties' resources, and avoid inconsistent judgments — all in furtherance of the interests of justice.").

Finally, the Court's resolution of the instant dispute promotes efficiency by avoiding the delays associated with case transfer or refiling of dispositive motions that are currently fully briefed, and the parties have not addressed whether another state may have a greater interest in vindicating any social policies implicated by this securities litigation. <u>See</u> <u>In re</u> <u>John's Overtime Litig.</u>, 877 F.3d 756, 762 (7th Cir. 2017) ("Avoiding duplicative litigation is desirable to prevent the economic waste ... [that] would have an adverse effect on the prompt and efficient administration of justice.") (internal quotation marks omitted).

\* \* \*

In sum, after applying the preceding three-part framework for review, viewing the facts in the light most favorable to Plaintiff, and drawing all reasonable inferences in favor of jurisdiction,

the Court concludes that Plaintiff has made a prima facie showing sufficient to survive the Stilwell Fund Defendants' jurisdictional challenge.   The exercise of specific personal jurisdiction over the Stilwell Fund Defendants is thus appropriate at this stage of the pretrial proceedings.   <u>Consulting Eng'rs</u>, 561 F.3d at 277.   To counter this prima facie showing and avoid the exercise of personal jurisdiction, the Stilwell Fund Defendants must present a compelling case that the "presence of some other considerations would render jurisdiction [so] unreasonable" as to "offend traditional notions of fair play and substantial justice." <u>Medmarc</u>, 669 F. Supp. 3d at 560-61.   They have not identified any other considerations that would render jurisdiction so unreasonable, and thus the Fund Defendants' argument for personal jurisdiction-based dismissal under Rule 12(b)(2) is **DENIED**.

## B. Individual Defendants' Motion to Dismiss

Having resolved the sole jurisdictional challenge, the Court now turns to the merits of the Individual Defendants' motion to dismiss.[11]   ECF No. 25.   Plaintiff's first count alleges breach of fiduciary duty directly and derivatively against the Individual Defendants.[12]   ECF No. 1, at 37.   In Count I, Plaintiff claims that

---

[11] The Individual Defendants' 12(b)(6) motion (challenging Count I) requires resolution before the Fund Defendants' 12(b)(6) motion (challenging Count II) because the sufficiency of the allegations in Count II depend in part on the sufficiency of Count I.

[12] Plaintiff appears to allege that the Individual Defendants breached their fiduciary duties through two series of decisions.   First, the Individual Defendants "failed to authorize the Company to make any genuine offers in

34

the Individual Defendants — each a Wheeler director except for Franklin, the CEO — breached their fiduciary duties owed to the Company, to Plaintiff, and to the putative Class.[13]  Id.   In Count III, Plaintiff alleges unjust enrichment directly and derivatively against certain Individual Defendants (the so-called "Conflicted Insiders"), namely directors Stilwell, Borrack, Campbell, Poskon, Parisi, and CEO Franklin.  Id. at 40.

The Individual Defendants seek dismissal on three grounds. First, they argue that Plaintiff cannot satisfy Rule 23.1 of the Federal Rules of Civil Procedure with respect to his derivative claims in Counts I and III because he failed to make an adequate "[litigation] demand" on Wheeler before filing suit.  ECF No. 25, at 16, 23.  And even if Plaintiff did make an adequate demand, the Individual Defendants maintain, Plaintiff does not fairly represent the interests of other similarly situated shareholders as required

---

2022 or 2023 to repurchase Series D shares prior to the Redemption Date, despite the Company having adequate cash on hand and available assets to make such an offer to Series D shareholders, including at least $7 million in cash that was instead invested in [one Fund Defendant], which resulted in the severe dilution and reduction in the price of Wheeler's common stock." ECF No. 1, at 38.  Second, the Individual Defendants authorized Wheeler to pay interest to Noteholders in discounted D Stock shares instead of available cash, which increased the Company's exposure to D Stock redemptions in addition to diluting and reducing the price of Wheeler's common stock.  Id. at 38.

[13] By way of clarification, Plaintiff's claims brought on behalf of the putative class (Wheeler common stockholders who did not participate in the Rights Offering and were allegedly harmed by the Defendants' actions) are part of his direct action, not his derivative action.  ECF No. 1, at 35; ECF No. 32, at 25; see Shenker v. Laureate Educ., Inc., 411 Md. 317, 345, 983 A.2d 408, 424 (2009) ("In contrast to a derivative action, a shareholder may bring a direct action, either individually or as a representative of a class, against alleged corporate wrongdoers" under certain circumstances.).

35

under Rule 23.1 to bring a derivative claim.  Id.  Second, to the extent Plaintiff purports to bring the Count I breach of fiduciary duty claim directly (thereby avoiding Rule 23.1's derivative suit requirements), such claim must be dismissed as it cannot form the basis for a direct cause of action.  Id. at 25.  Third, the Individual Defendants separately maintain that Counts I and III fail to state a claim under Rule 12(b)(6).  Id. at 29.  The Court addresses each contention in turn.

### 1. Rule 23.1

### a. Demand Letter

As previously noted, Rule 23.1 of the Federal Rules of Civil Procedure authorizes a shareholder to bring a "derivative action to enforce a right that the corporation or association may properly assert but has failed to enforce."  Fed. R. Civ. P. 23.1(a). However, Rule 23.1 requires that the named plaintiff "fairly and adequately represent[s] the interests of shareholders or members who are similarly situated in enforcing the right of the corporation."  Id.  Additionally, Rule 23.1(b) provides heightened pleading standards, which require that the complaint "state with particularity . . . (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort."  Fed. R. Civ. P. 23.1(b)(3).

Because Wheeler is incorporated under Maryland law, Maryland law defines the standard for evaluating the sufficiency of the Plaintiff's efforts to "obtain the desired action from the directors or comparable authority," known as the "pre-suit demand" requirement of Rule 23.1(b)(3). See Star v. TI Oldfield Dev., LLC, 962 F.3d 117, 134 (4th Cir. 2020) ("In evaluating a derivative claim, a federal court must determine the adequacy of pleading under federal law but determine the sufficiency of the pre-suit demand under the substantive law of the state of incorporation.") (citing Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 108-09 (1991)).

Drawing on this legal background, the Individual Defendants argue that Plaintiff failed to make the requisite pre-suit demand on Wheeler, and that the demand requirement was not excused under the circumstances of this suit. ECF No. 25, at 16. Before bringing a derivative suit in Maryland, the shareholder "must either make a demand on the board of directors that the corporation bring the suit, or show that demand is excused as futile." Bender v. Schwartz, 172 Md. App. 648, 666, 917 A.2d 142, 152 (Md. Ct. App. 2007). Once a demand is made, the corporation's board of directors must investigate the allegations in the demand and "determine whether pursuing the demanded litigation is in the best interests of the corporation." Id.; Werbowsky v. Collomb, 362 Md. 581, 602,

766 A.2d 123, 135 (2001) ("[T]he complaining stockholder must make demand upon the corporation itself to commence the action.").

Maryland's demand requirement is "strictly construed" and "frequently leads to the dismissal of derivative actions." JFURTI, LLC v. Forum Partners Investment Management, LLC, No. 16 Civ. 8633, 2017 WL 1753487, at *8 (S.D.N.Y. Apr. 27, 2017) (applying Maryland law and granting a motion to dismiss based on an insufficient demand letter); see also Burt Shearer Trustee v. Adams, No. 3:09cv991, 2010 WL 3782162, at *5 (M.D. Tenn. Sept. 21, 2010) (same). For a communication to constitute a Rule 23.1 demand, the communication at a minimum "must identify the alleged wrongdoers, describe the factual basis of the wrongful acts and the harm caused to the corporation, and request remedial relief." Bender, 172 Md. App. at 669, 917 A.2d at 154 (citing Allison on Behalf of General Motors Corporation v. General Motors Corp., 604 F. Supp. 1106, 1117 (D. Del. 1985)). In articulating the requirements for a communication to constitute a demand, the Bender Court further noted that "[i]n most instances, the shareholder need not specify his legal theory, every fact in support of that theory, or the precise quantum of damages," before concluding that "[e]ach claim must be articulated specifically enough to give directors a fair opportunity to initiate the action requested." Bender, 172 Md. App. at 670, 917 A.2d at 154.

38

Measured against the requirements of Maryland law, Plaintiff's letters to the Wheeler Board are fatally devoid of any reference to prospective litigation and legal claims for corporate management to consider bringing on behalf of Wheeler. See ECF No. 33-1. For example, on April 11, 2023, Plaintiff sent a letter to the Board of Directors expressing his concerns "that management and the Board are on a path toward pronounced value destruction," adding that he hopes "the Board and management understand the importance of ceasing any issuance of deeply discounted Series D or Series B preferred stock to holders of the Convertible Notes." ECF No. 33-1.

Wholly absent from Plaintiff's preceding critiques of the Company's capital decisions is any mention of a legal action that the Wheeler directors should consider pursuing on behalf of the Company, which is the purpose behind the pre-suit demand requirement. Werbowsky, 362 Md. at 602, 766 A.2d at 135 ("[T]he complaining stockholder must make demand upon the corporation itself to commence the action.") (emphasis added); Bender, 172 Md. App. at 669, 917 A.2d at 154 ("Each claim must be articulated specifically enough to give directors a fair opportunity to initiate the action requested.") (emphasis added); Mona v. Mona Elec. Grp., Inc., 176 Md. App. 672, 706, 934 A.2d 450, 469-70 (Md. Ct. Spec. App. 2007) (dismissing derivative claim because the plaintiff "did not demand, prior to filing suit, that the Board of

Directors initiate litigation on behalf of the company"); Oliveira v. Sugarman, 226 Md. App. 524, 538-39, 130 A.3d 1085, 1094 (Md. Ct. Spec. App. 2016), aff'd, 451 Md. 208, 152 A.3d 728 (2017) (requiring derivative plaintiffs "to at the outset, seek a corporate decision on whether to maintain a lawsuit, a prerequisite known as the demand requirement") (emphasis added); Hoecker v. Boynton Ocean, LLC, No. 05-80396-civ, 2005 WL 8156865, at *5 (S.D. Fla. Sept. 19, 2005) (applying Maryland law and finding that the letter at issue did not satisfy Rule 23.1's demand requirement because "[t]he letter makes no threat of legal action stemming from any alleged wrongdoing").

Plaintiff's letters' omission of any prospective legal claims for the directors to consider bringing on behalf of Wheeler is not merely a cosmetic deficiency, nor does the pre-suit demand requirement exalt form over substance. Rather, as the Maryland Court of Appeals explained in Werbowsky, the "function of the demand doctrine i[s] delimiting the respective powers of the individual shareholder and of the directors to control corporate litigation, [which] clearly is a matter of substance, not procedure." Werbowsky, 362 Md. at 601, 766 A.2d at 134 (internal quotation marks omitted). To that end, Maryland law requires that "[e]ach claim must be articulated specifically enough [in the demand] to give directors a fair opportunity to initiate the action requested" by the shareholder, a decision that directors often make

after receiving the "advice of a special litigation committee of independent directors" on whether to pursue claims against alleged wrongdoers. Werbowsky, 362 Md. at 619, 766 A.2d at 144; Bender, 172 Md. App. at 669, 917 A.2d at 154. By failing to notify the directors of his prospective derivative claims, Plaintiff short-circuited the corporate machinery designed to promote "meaningful pre-litigation alternative dispute resolution." Werbowsky, 362 Md. at 619, 766 A.2d at 144. Indeed, this right of the directors to first investigate and consider a derivative suit derives from a core principle of corporate law – that "[g]enerally, the business and affairs of a corporation, including the decision to institute litigation, are managed under the direction of its board of directors." Bender, 172 Md. App. at 665, 917 A.2d at 152.

In his arguments opposing Rule 23.1-based dismissal, Plaintiff first claims that he did make sufficient demands on previous Wheeler boards comprised of different directors. ECF No. 32, at 27. But this qualification does not change the fact that (1) Plaintiff's Complaint does not allege that he ever made a pre-suit demand on any Wheeler Board and (2) Plaintiffs' letters to previous Wheeler directors remain substantively deficient by failing to articulate the legal claims that the Board should consider bringing on behalf of the corporation. See ECF No. 1.

Next, Plaintiff argues that his letters do assert that the Board breached its fiduciary duties by, among other actions,

41

issuing shares of D Stock as interest payment on the Notes.   ECF No. 32, at 19-20.   However, Plaintiff's expression of his view that a corporate decision breached a fiduciary duty is not the equivalent of a "shareholder . . . alleg[ing] and prov[ing] that he, she, or it requested the directors to sue in the name of the corporation," as required under Maryland law.   Werbowsky, 362 Md. at 621, 766 A.2d at 145 (emphasis added).   This demand prerequisite requires that "each claim be articulated specifically enough to give directors a fair opportunity to initiate the action," which in this case would have also required Plaintiff to articulate his derivative claim for unjust enrichment.   Bender, 172 Md. App. at 669, 917 A.2d at 154; see Mona, 176 Md. App. at 706, 934 A.2d at 469-70 (dismissing a derivative claim where the demand letter failed to give the company notice of all of the plaintiff's bases for litigation); see also JFURTI, LLC v. F. Partners, 2017 WL 1753487 at *8 (applying Maryland law and dismissing derivative suit for failure to satisfy pre-suit demand requirement).   Indeed, insofar as Plaintiff's letters request any "action," it is not the initiation of a lawsuit he seeks, but rather a "genuine, constructive conversation" to discuss Wheeler's financial position in the hope that the Board would implement Plaintiff's business plan for buying back outstanding D Stock.   See ECF No. 33-1, at 4.

In a final effort to combat Rule 23.1 dismissal, Plaintiff cites JFURTI, LLC v. Singal for the proposition that he did not

need to "raise every cause of action he now alleges in the Complaint." No. 17 Civ. 7206, 2018 WL 6332907, at *9 (S.D.N.Y. Nov. 12, 2018). But the plaintiff in JFURTI had "served a written demand on each member of the Board of Directors . . . [requesting that they] take legal action to recover damages and obtain relief . . . for the fraud [and] breaches of fiduciary duty" in addition to several other legal claims. JFURTI, LLC v. Singal, No. 17 Civ. 7206, ECF No. 36, at *2-3. Plaintiff's letters here are meaningfully different from the JFURTI plaintiff's letters' (and complaint's) express and expansive request for the initiation of legal action, as Plaintiff's letters here not only fail to request any legal action on behalf of Wheeler, but his Complaint does not even claim that a litigation demand was submitted. See ECF No. 1. Instead, Plaintiff's Complaint only describes the Wheeler directors' alleged conflicts of interest that supposedly justified Plaintiff's decision not to submit a demand letter, maintaining that he "has not made a demand on the Demand Board to investigate or pursue the derivative claims herein because demand is excused as futile." ECF No. 1, at 30.

At bottom, none of Plaintiff's letters to the Wheeler Board (when considered individually or together) meet the requirement for a pre-suit litigation demand letter under Rule 23.1, and thus Plaintiff's derivative claims may only survive dismissal if demand

was excused as "futile" under Maryland law. <u>Werbowsky</u>, 362 Md. at 602, 766 A.2d at 135.

### b. Futility Exception to the Demand Requirement

The pre-suit demand requirement is subject to one "well-recognized" exception — that prior demand is not required when such demand would be "futile." <u>Werbowsky</u>, 362 Md. at 602, 766 A.2d at 135; <u>Laidlaw v. Beneficial Bancorp, Inc.</u>, No. 24-c-17-1057, 2017 WL 8942454, at *3 (Md. Cir. Ct. Aug. 08, 2017) ("Futility is the only exception to Maryland's demand requirement."). However, this futility exception is "unusually exacting under Maryland law." <u>JFURTI, LLC v. F. Partners</u>, 2017 WL 1753487, at *8. In <u>Werbowsky</u>, the Maryland Court of Appeals explained the futility exception in great detail, observing that demand futility is:

> a very limited exception, to be applied only when the allegations or evidence clearly demonstrate, in a very particular manner, either that (1) a demand, or a delay in awaiting a response to a demand, would cause irreparable harm to the corporation, or (2) a majority of directors are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule.

<u>Werbowsky</u>, 362 Md. at 602, 766 A.2d at 144. Consistent with this exacting standard, demand is not excused under Maryland law simply because "a majority of the directors approved or participated in some way in the challenged transaction or decision." <u>Id.</u> at 618, 143. Underscoring the "narrowness" of Maryland's demand futility exception, the Maryland Court of Appeals has explained that even a

"director that expects to derive a personal benefit from a corporate transaction — and is therefore not disinterested — is not necessarily so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule." Oliveira v. Sugarman, 451 Md. 208, 229, 152 A.3d 728, 741 (2017) (internal quotation marks omitted).

Mindful of this exacting legal standard, the Court turns to Plaintiff's argument that demand was futile. Plaintiff does not claim that Werbowsky's first irreparable harm-based exception is applicable, but instead relies on the second exception, contending that a majority of Wheeler's directors are so personally and directly conflicted or committed to the decision in dispute to excuse a pre-suit demand. Werbowsky, 362 Md. at 620, 766 A.2d at 144; ECF No. 1, at 30-34. Accordingly, the Court examines the allegations against each individual director to determine whether Plaintiff has adequately alleged that a majority are so conflicted.

To start, Plaintiff alleges that Individual Defendant-directors Borrack and Parisi have disabling conflicts and financial interests, a claim based on the fact that both directors are employed by Stilwell, and thus purportedly stand to benefit financially from Stilwell and his Funds' financial interest in the challenged transactions (issuance of shares of D Stock and the Notes conversion). ECF No. 1, at 32. But this type of demand

45

futility argument is directly undermined by the standards articulated in Oliveira and Werbowsky, the latter opinion noting that the demand requirement is not excused based on "speculative allegations that [directors] are conflicted or are controlled by other conflicted persons . . . or would be hostile to the [remedial] action." Werbowsky, 362 Md. at 618, 766 A.2d at 143-44. Plaintiff's allegations of disabling conflict against Parisi and Borrack plainly rely on impermissible speculation that such directors could not respond to a demand in good faith because of Stilwell's controlling influence and "the[ir] expect[ation] to derive a personal benefit" as employees of his investment fund. Oliveira, 451 Md. at 229, 152 A.3d at 741 (explaining that a "director that expects to derive a personal benefit from a corporate transaction" is not necessarily unable to respond reasonably to a pre-suit demand). At bottom, Plaintiff's allegations against directors Borrack and Parisi, without more, are insufficient to justify the "unusually exacting" futility exception to the demand requirement. JFURTI, LLC v. F. Partners, 2017 WL 1753487, at *8-9.

Next, Plaintiff alleges that Individual Defendant-director Campbell has a disabling conflict justifying the futility exception. Plaintiff's allegation is solely premised on the fact that Campbell owns $100,000 worth of the Notes, which represent "the entirety of Defendant Campbell's stock ownership" in Wheeler.

ECF No. 1, at 15, 32-33.  But the fact that Campbell participated in Wheeler's Rights Offering — an opportunity offered to all common stockholders — and purchased Notes, without more, does not rise to the level of conflict required to excuse demand as futile.  Indeed, under Maryland law, directors are "presumed to act properly and in the best interest of the corporation . . . and their control of corporate affairs should not be impinged based on non-specific or speculative allegations of wrongdoing."  Werbowsky, 362 Md. at 618-19, 766 A.2d at 144.  Plaintiff offers little more than speculation that Campbell could not reasonably respond to a litigation demand, speculation that is based on the fact that Campbell owns Notes and "approved or participated in some way in the challenged transaction or decision," a type of pleading that Maryland courts have deemed insufficient to justify the futility exception.[14]  Id.

---

[14]  Moreover, even assuming that the preceding three directors were conflicted, such conflicts alone do not excuse the demand requirement as it is "well established" under Maryland law that "an interested board of directors can utilize an SLC [Special Litigation Committee] to respond to a shareholder demand and avoid the demand being excused entirely."  Oliveira, 226 Md. App. at 542 n.11 (citing Werbowsky, 362 Md. at 619, 766 A.2d at 123).  The Oliveira court cautioned that demand is excused only in "very extreme circumstances," and noted that it has become "a common practice" for interested, non-independent directors to seek the advice of a special litigation committee regarding a pre-suit demand.  Id.  Indeed, the Maryland Court of Appeals has observed that "one justification for the expanded demand requirement is to give the corporation ([encumbered by allegations or the existence of adverse interests]) an opportunity to engage an SLC."  Boland v. Boland, 423 Md. 296, 331, 31 A.3d 529, 550 n.25 (2011).  Therefore, to the extent that Plaintiff maintains that the existence of a conflicted board necessarily excuses the demand requirement, such position cannot prevail here.

Given that the allegations against defendant directors Borrack, Parisi, and Campbell are insufficient to demonstrate the futility of a pre-suit demand, the Court need not reach the question of whether Stilwell is so conflicted. Plaintiff has only alleged that the preceding four directors are so conflicted, and since at least three of these allegations are insufficient, Plaintiff has not demonstrated that a majority of the Wheeler Board of seven cannot reasonably be expected to respond to a litigation demand in good faith. Werbowsky, 362 Md. at 620, 766 A.2d at 144. And even assuming arguendo that Stilwell is so conflicted, Stilwell is only one of seven directors, and thus Plaintiff still fails to show that a majority of Board members were sufficiently conflicted. Accordingly, demand was not excused in this circumstance under the futility exception.[15]

---

[15] Plaintiff cites three cases where demand was deemed futile, but each case is distinguishable and ultimately unpersuasive. First, in Laidlaw v. Beneficial Bancorp, Inc., the Maryland trial court denied a motion to dismiss, finding that the plaintiff reasonably inferred that making demand upon the board would be futile because the board "voted themselves a windfall" of over $14 million in stock compensation, thereby creating an inference that the Board could not "reasonably be expected to respond in good faith to a demand that they relinquish [such] benefits." No. 24-C-17-1057, 2017 WL 8942454, at *5 (Md. Cir. Ct. Aug. 08, 2017). There, the directors provided themselves "more than a decade's typical compensation in a single transaction," a situation appreciably different from that alleged here, where directors Borrack and Parisi are not alleged to have received any direct financial benefit from the challenged transaction, and Campbell is alleged to have participated in a Rights Offering open to all common stockholders. Id. Second, Plaintiff cites Hibbard v. American Finance Trust, Inc., where a New York court applying Maryland law found that allegations that "directors received compensation from two [separate companies'] boards with opposing interests" was sufficient to excuse demand. No. 655339/2018, 2021 WL 6005261, at *7 (N.Y. Sup. Ct. Dec. 20, 2021). But a leading treatise on Maryland corporate law has called into question the strength of Hibbard's interpretation of Maryland's demand futility exception, limiting the opinion's persuasive value here. See James J. Hanks,

\* \* \*

In summary, Plaintiff has plainly failed to submit a pre-suit litigation demand to the Wheeler Board as required by Rule 23.1, and Plaintiff has not demonstrated that the "very limited exception" of demand futility applies here. Werbowsky, 362 Md. at 620, 766 A.2d at 144. Because Plaintiff's Complaint "fails to allege sufficient facts which, if true, would demonstrate the futility of a demand, it is entirely appropriate to terminate the action on a motion to dismiss." Id. at 145, 620; see Weinberg ex rel. BioMed Realty Tr., Inc. v. Gold, 838 F. Supp. 2d 355, 362 (D. Md. 2012) (dismissing shareholder derivative suit where the plaintiff failed to make a pre-suit demand and demand was not excused as futile). The Individual Defendants' motion to dismiss is thus **GRANTED** as to all of Plaintiff's derivative claims in Counts I, II, and III.[16]

### 2. Challenge to Plaintiff's Remaining Direct Claims

In addition to the Individual Defendants' successful Rule 23.1-based challenge to Plaintiff's derivative claims, the

---

Jr., Maryland Corporation Law § 7.22, at C. Demand on Directors (1994, 2015 Supp.) ("Contrary to the opinion of [Hibbard], where there are at least some disinterested directors, demand is not excused."). Plaintiff's final citation to Felker v. Anderson, No. 04 Civ. 0372, 2005 WL 602974 (W.D. Mo. Feb. 11, 2005) is not entitled to significant weight as Felker has been recognized by other courts as "an improper application of Maryland law and as generally unpersuasive." Seidl v. American Century Cos., 713 F. Supp. 2d 249, 258 n.13 (S.D.N.Y. 2010) (applying Maryland law).

[16] As a result of such ruling, the Court need not address whether Plaintiff satisfies Rule 23.1(a)'s requirement that he "fairly and adequately represent the interests of shareholders." Fed. R. Civ. P. 23.1(a).

Individual Defendants argue that Plaintiff's direct claims should be dismissed because direct relief is not available when a plaintiff suffers the same harm as all other shareholders. ECF No. 25, at 29. While the Individual Defendants seek the dismissal of "the Complaint" on this basis — and thus presumably seek dismissal of both counts I and III alleged against the directors — the Individual Defendants' supporting arguments and authorities here focus on the viability of Count I, which addresses share dilution. The Court accordingly focuses its discussion on Plaintiff's first count, which alleges that breaches of fiduciary duties by Wheeler's Board and management led to the "severe dilution and reduction in the price of Wheeler's common stock." ECF No. 1, at 38.

Since Wheeler is incorporated in Maryland, the parties agree that Maryland law applies to Plaintiff's direct claim alleging breach of fiduciary duty. See Edgar v. MITE Corp., 457 U.S. 624, 645 (1982) (noting that under the "internal affairs" doctrine, "only one State should have the authority to regulate a corporation's internal affairs"); see also 4D-Enterprises, LLC v. Aalto Hyperbaric Oxygen, Inc., No. 119cv1504, 2020 WL 13750856, at *8 n.8 (E.D. Va. July 10, 2020) (finding that the law of the state of incorporation applies to breach of fiduciary duty claims). Under Maryland law, a harm suffered by both the shareholders and the corporation alike can only support a shareholder derivative

claim. Oliveira, 451 Md. at 240, 152 A.3d at 747. Generally, a decline in stock value does not give rise to a direct claim because both the shareholders and the corporation have suffered the same financial loss. Id. (citing Waller v. Waller, 187 Md. 185, 189-90, 49 A.2d 449, 449-50 (1946)). Instead, to maintain a direct action, the shareholder must allege that he has suffered "an injury that is separate and distinct from any injury suffered either directly by the corporation or indirectly by the stockholder because of the injury to the corporation." Oliveira, 451 Md. at 240, 152 A.3d at 748 (citing James J. Hanks, Jr., Maryland Corporation Law § 7.12(b), at 276.18 (1994, 2015 Supp.)).

Though the foregoing principles limit the availability of direct shareholder claims, the Maryland Court of Appeals has recognized that share dilution "in some circumstances can support a direct claim" (emphasis added).[17] Oliveira, 451 Md. at 243, 152

---

[17] Numerous authorities on Maryland law have recognized the viability, under certain circumstances, of a shareholder's direct claim against directors for breach of fiduciary duties. Eastland Food Corp. v. Mekhaya, 486 Md. 1, 74, 301 A.3d 308, 352 (2023) (Booth, J., concurring) ("[T]his case is the first instance in which this Court has considered the effect of the 2016 legislative amendments to the directors' statutory standard of conduct, which now provides a stockholder with a right to bring a direct claim against corporate directors."); see Bill Carson & Scott Wilson, The Director Duties Bill: Amendments to Section 2-405.1 of the Maryland General Corporation Law, 49-OCT Md. B.J. 40, 41 (2016) (observing that "it is the legislative intent that the standard of conduct run directly to the stockholders of a Maryland corporation under limited circumstances and that the stockholders have a direct remedy for any breach of the standard of conduct in such circumstances"); see also Hanks, § 6.06B, 6-46 ("[A] stockholder's right to sue a director directly or derivatively for failure to comply with the statutory standard of conduct will be determined under applicable case law, which distinguishes between injury to the corporation (derivative claim available) and injury to the stockholder (derivative claim not available).").

A.3d at 749; see St. Clair-Hibbard v. American Finance Trust, Inc., 812 F. App'x 36, 40 (2d Cir. 2020) (interpreting Maryland law and finding that "Maryland courts have recognized ([that a dilution claim may]) sometimes be prosecuted directly").  In explaining the viability of a direct share dilution claim, the Oliveira Court listed the important elements for such claim that were missing from the plaintiff's complaint there.  Oliveira thereby instructed that a plaintiff must "allege share dilution in their complaint," along with "facts detailing the impact of such dilution" by "[indicating] how much [the plaintiff's] shares were allegedly diluted, what effect that dilution had on [the plaintiff's] voting power, if any, or what financial loss [the plaintiff] might have suffered due to such dilution."  Oliveira, 451 Md. at 243-44, 152 A.3d at 749-50; see also St. Clair-Hibbard, 812 F. App'x at 40.

Applying the foregoing Oliveira standards here, Plaintiff's first count plainly alleges share dilution, claiming that the Board's failure to "make any genuine offers . . . to repurchase Series D shares" resulted in the "severe dilution and reduction in the price of Wheeler's common stock."  ECF No. 1, at 37-38. Further, Count I alleges that the decision to pay interest to Noteholders in Series D shares "caused further dilution and reduction in the price of Wheeler's common stock."  Id.  Count I also "incorporates and realleges" all of the allegations of the

Complaint, which expressly state the degree of dilution of Plaintiff's common shares and the attendant reduction in Plaintiff's voting power: "Plaintiff . . . had his stake diluted to 1.2 percent or less of outstanding shares, a dramatic reduction in his ownership and voting power of approximately 90 percent or more." ECF No. 1, at 6.   In light of Count I's well-developed allegations of share dilution caused by the Individual Defendant-directors' supposed breach of fiduciary duty, the Individual Defendants have not carried their burden to demonstrate that Count I fails to state a direct claim, and thus have not demonstrated that dismissal is appropriate at this stage.[18]

### 3. 12(b)(6) Challenge to Counts I and III

Because the Individual Defendants fail to carry their burden to demonstrate that Counts I and III cannot proceed as direct claims, the Court next considers their 12(b)(6) argument for dismissal, which contends that Plaintiff fails to state a cognizable claim. ECF No. 25, at 29. To that end, the Individual Defendants first maintain that Count I fails to state a claim for breach of fiduciary duty because Plaintiff does not allege sufficient facts to overcome Maryland's codified "business judgment rule," and fails to allege sufficient facts to overcome the

---

[18] To the extent the Individual Defendants seek dismissal of Count III on the same basis (that Plaintiff cannot state Count III directly), such argument is underdeveloped, and the Court thus declines to dismiss Count III's direct claims on this basis.

immunity extended to the Board by Wheeler's corporate charter. Second, the Individual Defendants argue that Count III fails to plead the facts necessary to state a claim for unjust enrichment. The Court addresses each argument in turn.

### a. Count One

### i. Business Judgment Rule

The parties agree that Maryland substantive law applies to Plaintiff's first count alleging a direct claim for breach of fiduciary duty. See Edgar, 457 U.S. at 645. Additionally, the parties agree that the legal duties applicable to Wheeler's Board of Directors are set out in section 2-405.1 of the Maryland Corporations and Associations Code (the "MCA"), which provides that a "director of a corporation shall act: (1) In good faith; (2) In a manner the director reasonably believes to be in the best interests of the corporation; and (3) With the care that an ordinarily prudent person in a like position would use under similar circumstances." MCA § 2-405.1(c). Under § 2-405.1(g), an act of a director of a corporation is "presumed to be in accordance" with the foregoing duties enumerated in § 2-405.1(c). Section 2-405.1 thus codifies the so-called "business judgment rule," Oliveira, 451 Md. at 222, 152 A.3d at 736, a presumption that in making a business decision the directors of a corporation "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."

_Cherington Condo. v. Kenney_, 254 Md. App. 261, 278, 272 A.3d 852, 862-63 (2022).

While it is undisputed that most Individual Defendants, as Wheeler directors, will receive the benefit of the presumption codified in MCA § 2-405.1, the parties disagree on the applicability of the business judgment rule at the 12(b)(6) stage of review.  Plaintiff, seeking to avoid dismissal, cites _Goldstein v. Berman_ for the proposition that "the applicability of the business judgment rule is largely a question of fact that is not appropriate for determination based solely on the allegations of the complaint."  No. Civ. 12-2507, 2014 WL 824050, at *5 (D. Md. Feb. 28, 2014).  The Individual Defendants counter that the _Goldstein_ court's preceding observation is limited to the facts of that case, and posit that the acceptance of such proposition would improperly allow plaintiffs to routinely avoid business judgment rule-based dismissal at the 12(b)(6) stage.

In light of this dispute, this Court has canvassed legal authorities on the propriety of granting 12(b)(6) dismissal based on an application of the business judgment rule.  The majority of federal courts across jurisdictions have cautioned that the "business judgment rule is highly fact dependent and, therefore, inappropriate for consideration on a motion to dismiss."  _F.D.I.C. v. Baldini_, 983 F. Supp. 2d 772, 783 (S.D. W. Va. 2013); _see Haworth, Inc. v. Janumpally_, No. 5:17cv423, 2018 WL 3978173, at

55

*15 (E.D.N.C. Aug. 20, 2018) ("[T]he court at this juncture declines to dismiss [the] plaintiff's remaining breach of fiduciary duty claim . . . [t]he moving defendants do not cite binding Fourth Circuit authority for the proposition that a plaintiff must 'plead around the business judgment rule.'") (internal quotations omitted); In re Tower Air, Inc., 416 F.3d 229, 238 (3d. Cir. 2005) ("Generally speaking, we will not rely on an affirmative defense such as the business judgment rule to trigger dismissal of a complaint under 12(b)(6)."); Court Appointed Receiver of Lancer Offshore, Inc. v. Citco Grp. Ltd., No. 05-60080, 2008 WL 926509, at *5 (S.D. Fla. Mar. 31, 2008) ("[T]he Court considers it unwise to evaluate conduct and determine whether or not it is protected by the business judgment rule at the motion to dismiss stage."); In re Luxottica Grp. S.p.A., Sec. Litig., 293 F. Supp. 2d 224, 238 (E.D.N.Y. 2003) (finding that the exercise of business judgment by director defendants is a question of fact not to be considered on a dismissal motion); Federal Sav. and Loan Ins. Corp. v. Musacchio, 695 F. Supp. 1053, 1064 (N.D. Cal. 1988) ("[A] ruling on the applicability of the business judgment rule is peculiarly a question of fact, wholly inappropriate for consideration on a motion to dismiss.").

Notwithstanding what has been characterized as "overwhelming" authority counselling against the application of the business judgment rule at the 12(b)(6) stage of review, Baldini, 983 F.

56

Supp. 2d at 783, a minority of reviewing courts have applied such rule at the 12(b)(6) stage. See, e.g., Allyn v. CNL Lifestyle Properties, Inc., No. 6:13cv132, 2013 WL 6439383, at *4 (M.D. Fla. Nov. 27, 2013) (applying Maryland law and granting motion to dismiss where the plaintiff's complaint did not contain factual allegations sufficient to rebut the presumption that the director defendants acted in accordance with Maryland's codified business judgment rule).

The Court, for two principal reasons, finds more persuasive the former preponderant view cautioning against premature application. First, reviewing courts have described application of the business judgment rule as "highly fact intensive," and recognize that overcoming its presumptions on the merits can be "a near-Herculean" task. In re Tower Air, 416 F.3d at 238. Mandating such fact intensive pleading would arguably be in tension with Rule 8 of the Federal Rules of Civil Procedure, which requires only a "short and plain statement of the claim showing that the pleader is entitled to relief" so as to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Twombly, 550 U.S. at 555; see In re Tower Air, 416 F.3d at 236; see also Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford, 554 F. Supp. 2d 538, 556 (D. Del. 2008). Second, as the business judgment rule is often recognized as an affirmative defense, a motion to dismiss "generally cannot reach the merits of

an affirmative defense" unless "all facts necessary to the affirmative defense clearly appear <u>on the face of the complaint</u>." <u>Goodman v. Praxair, Inc.</u>, 494 F.3d 458, 464 (4th Cir. 2007) (quoting <u>Richmond, Fredericksburg & Potomac R.R. v. Forst</u>, 4 F.3d 244, 250 (4th Cir. 1993)).  Here, the Individual Defendants have not demonstrated that Plaintiff's Complaint clearly articulates all the facts necessary to reach the merits of business judgment rule protections at this juncture, and thus have not carried their burden to win dismissal.

In sum, to the extent the Individual Defendants seek dismissal of Count I's remaining direct claims based on purported business judgment rule protections, their motion to dismiss is denied on this ground.

### ii. Corporate Charter Immunity

The Court next addresses the Individual Defendants' argument that Wheeler's corporate charter exculpates all directors and officers from liability for monetary damages, and considers whether Count I's breach of fiduciary duty claims (as alleged directly) should be dismissed based on such corporate charter-provided immunity.  ECF No. 25, at 34.

In Maryland, a corporation may include a provision in its charter limiting the liability of its directors and officers to the corporation or its shareholders for money damages.  <u>See</u> Md. Code Ann., Corps. & Ass'ns § 2-405.2; Md. Code Ann., Cts & Jud.

Proc. § 5-418.   Wheeler's corporate charter does just that in Article VIII, reading: "To the maximum extent that Maryland law in effect from time to time permits limitation of the liability of directors and officers of a corporation, no present or former director or officer of the Corporation shall be liable to the Corporation or its stockholders for money damages."   ECF No. 25, Ex. 5, at 21.

Notwithstanding the robust limitation of liability permitted by Maryland law and invoked by the Wheeler charter, a charter's exculpation clause may not limit liability to the extent that a director or officer (1) actually received an "improper benefit," or (2) engaged in "active and deliberate dishonesty."   Md. Code Ann., Cts & Jud. Proc. § 5-418; Hayes v. Crown Cent. Petroleum Corp., 78 F. App'x 857, 865 (4th Cir. 2003).   Therefore, the Individual Defendants argue that because Plaintiff's Complaint fails to allege that the directors either received an improper benefit or engaged in active and deliberate dishonesty, Wheeler's exculpation clause forecloses Plaintiff's breach of fiduciary claim (Count I) to the extent it seeks monetary damages.   ECF No. 25, at 34.

Setting aside the merits of the Individual Defendants' preceding argument for dismissal, the Court observes that numerous district courts applying Maryland law have determined that it is imprudent to rule on corporate charter-based exculpation at the

motion to dismiss stage.  See Zucker, Tr. of Anita G. Zucker Tr. Dated Apr. 4, 2007 v. Bowl Am., Inc., No. cv-21-1967, 2022 WL 7050991, at *3-4 (D. Md. Oct. 11, 2022); Kurlander v. Kaplan, No. 819cv644, 2019 WL 3944335, at *6 (M.D. Fla. Aug. 21, 2019) (applying Maryland law and declining to rule on corporate charter-based liability at the Rule 12(b)(6) stage); see also Malpiede v. Townson, 780 A.2d 1075, 1092 (Del. 2001) ("In the case of a Rule 12(b)(6) motion, [if a charter provision limiting director liability] is raised for the first time in the [dismissal] motion or brief in support of the motion, it is a matter outside the pleading.").

Considering the reasoning underlying these authorities, in Zucker, the District of Maryland observed that the "protection of an exculpatory charter provision appears to be in the nature of an affirmative defense," and reviewing courts generally do not "resolve contests surrounding . . . the applicability of defenses through a Rule 12(b)(6) motion."  Zucker, 2022 WL 7050991, at *3-4 (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)) (internal quotation marks omitted).  As noted, only in the "relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint" may the Court resolve the dispute at the 12(b)(6) stage.  Goodman, 494 F.3d at 464.  Accordingly, reviewing courts have declined to rule on the applicability of a charter exculpation provision when such

provision is not referenced in the complaint, reasoning that without such provision, the "facts necessary to the affirmative defense of exculpation do not clearly appear on the face of the . . . [c]omplaint." Zucker, 2022 WL 7050991, at *4; see also Frederick v. Corcoran, No. 370685, 2013 Md. Cir. Ct. LEXIS 5, at *49 (Md. Cir. Ct. Aug. 14, 2013) ("The [charter immunity] issue is raised in the defendants' briefs but is not included in the plaintiffs' amended complaint.   For that reason alone, the court declines to address it on a motion to dismiss.").

With this guidance in mind, the Court notes that Plaintiff did not reference the exculpation provision in his Complaint, nor did he attach Wheeler's corporate charter to the Complaint. Accordingly, the Court is not prepared to find that "all facts necessary to the affirmative defense clearly appear on the face of the complaint," and thus declines to rule on the merits of the Individual Defendants' charter-exculpation argument at this stage of the litigation.   Goodman, 494 F.3d at 464 (quoting Richmond, 4 F.3d at 250).[19]  Defendants "can of course re-raise the exculpation provision as an affirmative defense on a more fulsome factual record later in the proceeding."   Zucker, 2022 WL 7050991, at *4.

---

[19] The issues raised by the affirmative defense of charter exculpation, to some extent, depend on motive and state of mind, and thus will benefit from further factual development in discovery.

\* \* \*

In summary, the Individual Defendants have not carried their burden to demonstrate the procedural propriety of dismissing Count I's remaining direct claims based on either the business judgment rule or Wheeler's corporate charter immunity.  The Court next addresses the Individual Defendants' challenges to Plaintiff's third count alleging unjust enrichment.

### b. Count III – Unjust Enrichment

The Individual Defendants also seek dismissal of Count III, which alleges that the "Conflicted Insiders" (Individual Defendants Stilwell, Borrack, Campbell, Poskon, Parisi, and Franklin) and the Stilwell Fund Defendants were unjustly enriched through (1) their receipt of series D shares as interest on their Notes and (2) the discounts on the Conversion Price of their Notes.  ECF No. 1, at 40.  Moreover, Count III alleges that Stilwell and one of the Stilwell Fund Defendants were "unjustly enriched in receiving at least $7 million in investments by the Company in lieu of buying back Series D Shares."  Id.

To review, the Court earlier ruled that Plaintiff failed to satisfy Rule 23.1's prerequisites for bringing a derivative unjust enrichment claim, and thus the Court here addresses the Individual Defendants' challenge to Plaintiff's ability to pursue this claim directly.  To that end, the Individual Defendants argue that

Plaintiff has failed to plead facts sufficient to state a claim
for unjust enrichment.[20]   ECF No. 25, at 35-36.

In Maryland, the elements of unjust enrichment are: (1) a
benefit conferred upon the defendant by the plaintiff; (2) the
defendant's knowledge of the benefit; and (3) the acceptance by
the defendant of the benefit under such circumstances as to make
it inequitable to retain the benefit without payment of its value.[21]
Froelich v. Erickson, 96 F. Supp. 2d 507, 524 (D. Md. 2000) (citing
Klein v. Fidelity & Deposit Co., 117 Md. App. 317, 345, 700 A.2d
262, 277 (Md. Spec. App. 1997)).

Plaintiff's first theory of unjust enrichment maintains that
either he or the putative class of Wheeler common stockholders
conferred a benefit upon certain Individual Defendants because
these defendant-directors (and one officer) received interest
payments on their Notes through shares of D stock.  As previously
explained, some of these D Stock shares were eventually redeemed,
leading to Wheeler's dilutive issuance of more common stock to the
detriment of common stockholders.   Id.   For their part, the

---

[20] The Court here only addresses the Individual Defendants' arguments for
dismissal and will later consider the Stilwell Fund Defendants' arguments
for the dismissal of Count III (as articulated in a separate motion) as
alleged against them.  See ECF No. 27, at 34.

[21] The parties agree that the elements of an unjust enrichment cause of
action are substantially the same in both Maryland and Virginia, and any
differences between the two are immaterial for purposes of the resolution
of the instant motion to dismiss Count III.  See Integrated Direct Mktg.,
LLC v. May, 129 F. Supp. 3d 336, 374 n.32 (E.D. Va. 2015) (observing that
"the elements of an unjust enrichment cause of action are substantially the
same" in Maryland and Virginia); ECF No. 32, at 48.

Individual Defendants contend that Plaintiff's allegations fail to state a claim for unjust enrichment because neither Plaintiff nor the putative class of common stockholders performed a service for or provided any benefits to the relevant Individual Defendants. ECF No. 25, at 36.

After reviewing Plaintiff's Complaint and the 12(b)(6) briefing, the Court first observes that Plaintiff has not furnished any legal authority recognizing a direct claim for unjust enrichment based on a shareholder-plaintiff's equity dilution.[22] See ECF No. 32. To be sure, it is not Plaintiff's obligation to provide such corroborative authority. But the omission of support for Plaintiff's unusual theory of unjust enrichment underscores the incongruities between Plaintiff's pleading and the unjust enrichment paradigm. Indeed, the "usual case" of unjust enrichment involves a "plaintiff who, absent an express contract, performs a service for, or provides a benefit to, the defendant," where the defendant then "accepts the benefit of the service, but fails to compensate the plaintiff." Froelich, 96 F. Supp. 2d at 524. Under

---

[22] In notional support of his unjust enrichment claim, Plaintiff cites the following excerpted language from the Second Circuit's opinion in Strougo v. Bassini: "[i]n terms of the dilution that resulted from the rights offering, the participating shareholders actually benefited from the non-participating shareholder's injury." 282 F.3d 162, 175 (2d Cir. 2002). But Plaintiff has cited the preceding observation out of context. Strougo addressed claims for breach of fiduciary duties and violation of the Investment Company Act, and never considered nor suggested that share dilution could support a direct claim for unjust enrichment brought against the shareholders who participated in a widely available rights offering. Id.

such circumstances, the theory of "quasi-contract" permits a plaintiff to receive compensation for the value of the benefit he provided to the defendant.  Id.

In view of this underlying rationale for unjust enrichment-based recovery, the Individual Defendants have persuasively argued that the Complaint fails to state that Plaintiff personally conferred any benefit on the Individual Defendants as required to state a direct claim for unjust enrichment.  Neither the issuance of the shares of D Stock, nor the eventual dilutive issuance of common stock, constitutes a benefit conferred by Plaintiff (or the putative class) on the Noteholders.  When drawing reasonable inferences in Plaintiff's favor, Wheeler's issuance of shares to Noteholders cannot plausibly be interpreted as a "benefit or service" conferred by an individual shareholder-plaintiff (or a putative class of common stockholders) on other Noteholders who chose to purchase a debt security that was offered to all common stockholders.  See Froelich, 96 F. Supp. 2d at 524-25 (granting summary judgment for defendants on the plaintiff's claim that the defendants unjustly enriched themselves by replacing the plaintiff as CEO and diluting his stock interests to nearly zero).

Moreover, even if the issuance of D Stock did confer the requisite benefit on the Individual Defendants, Plaintiff has not pleaded facts sufficient to support the third element of unjust enrichment — that the retention of the shares would be

"inequitable" under these circumstances.  Id.  The fact that certain Individual Defendants received shares of D Stock as interest payments, as authorized to be paid to any participating shareholder by the prospectus for the Rights Offering, is insufficient to state "inequitable" retention.  See Stilwell Value Partners I, L.P. v. Prudential Mut. Holding Co., No. 06-4432, 2007 WL 2345281, at *12 (E.D. Pa. Aug. 15, 2007) (dismissing shareholders' claim for unjust enrichment where the challenged transaction was "warned of in the prospectus and was legal under the relevant regulations" and could not be found to be "unjust").

Plaintiff's second theory of unjust enrichment fails for similar reasons.  Plaintiff claims that certain Individual Defendants were unjustly enriched when they received discounts on the conversion price of their Notes to common stock.  ECF No. 1, at 40.  But Plaintiff again fails to provide any sufficient explanation as to how the Individual Defendants' discounted conversion of their Notes constituted a benefit conferred upon such directors (and one officer) by either Plaintiff or the putative class of Wheeler common stockholders.  See Stilwell Value Partners, 2007 WL 2345281, at *12.  And even if the Court could find that Plaintiff had adequately stated that he or the putative class conferred the requisite benefit, Plaintiff has not pleaded sufficient facts to support the notion that the Individual Defendants' conversion of their Notes was inequitable or unjust

under these circumstances, where conversion was available to all the common stockholders who chose to participate in the Rights Offering. See Carfagno ex rel. Centerline Holding Co. v. Schnitzer, 591 F. Supp. 2d 630, 636 (S.D.N.Y. 2008) (finding that because all shareholders were given the opportunity to participate in a rights offering, the defendant directors "cannot be said to have manipulated the corporate processes in order to engineer a dilutive transaction whereby they received an exclusive benefit") (internal quotation marks omitted).

Finally, Plaintiff claims that Stilwell and Stilwell Activist Investments, L.P. (one of the Stilwell Fund Defendants) were unjustly enriched by Wheeler's decision to invest "at least $7 million" in such fund. ECF No. 1, at 40. However, Plaintiff's Complaint again fails to state that he or the putative class conferred this alleged financial benefit on Stilwell or the Stilwell Fund Defendant. Compounding the flaws in Count III, Plaintiff does not provide sufficient facts to support the notion that Individual Defendant-directors Borrack, Campbell, Poskon, Parisi, or Franklin were enriched by Wheeler's investment in one of Stilwell's investment funds. See Eastland Food Corp. v. Mekhaya, 486 Md. 1, 41, 301 A.3d 308, 332 (2023) (affirming dismissal of unjust enrichment claim in the context of stockholder suit because "the benefits of excessive compensation and funds for

personal use came at the corporation's expense, not [plaintiff's] directly").

At bottom, in directly alleging unjust enrichment based on (1) the Board's issuance of D Stock shares for interest payments and (2) the Noteholders' discounted conversion of their Notes, Plaintiff has unconvincingly tried to shoehorn these allegations into an ill-suited theory of relief. See Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P., 936 F. Supp. 2d 376, 410 n.18 (S.D.N.Y. 2013) ("To the extent that Plaintiffs allege that [the defendant's] actions with respect to the 2009 Stock Option Plan diluted the value of Plaintiffs' shares, this also fails to state a claim . . . [because a] prima facie unjust enrichment claim requires allegations that the defendant . . . benefitted at Plaintiffs' expense."); Mina Inv. Holdings, Ltd. v. Lefkowitz, 51 F. Supp. 2d 486, 489 (S.D.N.Y. 1999) (dismissing a claim for unjust enrichment, in the context of a capital offering that diluted the plaintiffs' equity, because the plaintiffs "failed to allege, in anything other than conclusory terms, the dilution of their equity interest in [the company], the enrichment sustained by [the defendant], and the manner in which that enrichment was at Plaintiffs' expense"); see also Singer v. Dungan, No. 107888, 1992 WL 884986, at *4 (Va. Cir. Ct. Oct. 28, 1992) (dismissing claim for unjust enrichment where the plaintiff asserted that the defendants "appropriated" the plaintiff's equity by purchasing

newly issued shares for reduced value). Plaintiff thus has failed to plead facts sufficient to state a direct claim for unjust enrichment. Because Plaintiff's derivative unjust enrichment claim has already been dismissed, see supra Part III.B.1, the Individual Defendants' motion to dismiss Count III is granted as to all of the so-called "Conflicted Insiders" — Individual Defendants Stilwell, Borrack, Campbell, Poskon, Parisi, and Franklin.

### C. Stilwell Fund Defendants' Motion to Dismiss

The Court next turns to the Stilwell Fund Defendants' separate motion to dismiss, ECF Nos. 26 & 27, which seeks dismissal of Counts II and III under Rule 12(b)(6).

### 1. Count II

Plaintiff's second count alleges, directly and derivatively, that the Stilwell Fund Defendants aided and abetted the Individual Defendants' breaches of fiduciary duty. The Stilwell Fund Defendants' challenge to the viability of Plaintiff's derivative claims is summarily granted for all the reasons described above in Part III.B.1. In short, Plaintiff fails to satisfy the notice requirements of Rule 23.1. As to the Fund Defendants' challenge to Plaintiff's direct claims alleging aider and abettor liability, because Plaintiff's first count directly alleging breach of fiduciary duty remains viable, the Court addresses below the Fund Defendants' challenge to Count II's assertion of aider and abettor liability.

## a. Applicable State Law

The Stilwell Fund Defendants first argue that Virginia law should apply to Plaintiff's aiding and abetting claim and maintain that because Virginia law does not recognize such cause of action, Count II must be dismissed.  To support this proposition, the Fund Defendants cite several district court opinions applying Virginia law to a plaintiff's claim for aiding and abetting a breach of fiduciary duty.  See, e.g., St. Paul Fire & Marine Ins. Co. v. Hoskins, No. 5:10cv087, 2012 WL 748574, at *4 (W.D. Va. Mar. 7, 2012); AvalonBay Communities, Inc. v. Willden, No. 1:08cv777, 2009 WL 2431571, at *11 (E.D. Va. Aug. 7, 2009).  However, as Plaintiff points out, the foregoing opinions considered claims that did not implicate the internal affairs doctrine, which here requires the application of Maryland law to Count I, the underlying claim for breach of fiduciary duty.  See St. Paul Fire, 2012 WL 748574, at *1; see also AvalonBay Communities, 2009 WL 2431571, at *11.

To analyze the appropriate choice of law, the Court begins with the fundamentals.  This Court exercises its diversity jurisdiction over the instant suit, and a federal court sitting in diversity in Virginia should apply Virginia's choice of law rules, which respect the internal affairs doctrine.  Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 496 (1941); 4D-Enterprises, 2020 WL 13750856, at *8 n.8; see also United States v. Kolon Indus., Inc., 926 F. Supp. 2d 794, 814 (E.D. Va. 2013)

("As a general proposition, the law of the state of incorporation normally determines issues relating to the internal affairs of a corporation") (internal quotations omitted). To that end, the internal affairs doctrine counsels that the law of the state of incorporation should apply to "matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders." Edgar, 457 U.S. at 645.

Here, Wheeler is incorporated under Maryland law, and thus it is uncontroverted that Maryland law applies to Plaintiff's first count alleging the underlying claim for breach of fiduciary duty. That said, the Fund Defendants are correct that federal district courts sitting in Virginia have applied Virginia law to claims for aiding and abetting a breach of fiduciary outside the context of the corporate internal affairs doctrine. See St. Paul Fire, 2012 WL 748574, at *4; see also AvalonBay Communities, 2009 WL 2431571, at *6, n.5. In deciding to apply Virginia law in that context, another judge of this court reasoned that Virginia choice of law rules include the lex loci delicti doctrine, under which substantive rights are determined by the law of the jurisdiction where the alleged tort occurred (i.e. the tort of aiding and abetting a breach of fiduciary duty). AvalonBay Communities, 2009 WL 2431571, at *6, n.5.

Here, the application of the internal affairs doctrine complicates, and distinguishes, the choice of law analysis from

71

that in AvalonBay and St. Paul Fire. The parties have not found, nor has the Court located, a case in which a court applied Virginia's choice of law rules in the context of a claim for aiding and abetting a breach of fiduciary duty when the underlying breach of fiduciary duty claim is governed by the law of a different state of incorporation pursuant to the internal affairs doctrine. In the absence of such guidance, this Court must predict how the Virginia Supreme Court would rule if presented with this issue. Priv. Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc., 296 F.3d 308, 312 (4th Cir. 2002). In so doing, the Court may consider Virginia state court opinions, restatements of the law, treatises, and well-considered dicta. Id.

Incorporating these various authorities into the analysis, the Court first observes that Virginia-based district courts exercising diversity jurisdiction have repeatedly applied the internal affairs doctrine, and thus have applied the law of a different state of incorporation to a claim for breach of fiduciary duty. See Kolon Indus., Inc., 926 F. Supp. 2d at 814; 4D-Enterprises, 2020 WL 13750856, at *8 n.8. Claims for breach of fiduciary duty may sound in tort, and therefore the principle of lex loci delicti, or law of the place where the tort has been committed, has not been unfailingly adhered to in the corporate context. Id. Indeed, the parties here agree that under Virginia choice of law principles, Maryland law applies to Plaintiff's

breach of fiduciary duty claims, ECF No. 25, at 22, notwithstanding that such alleged breaches were plausibly committed in Virginia where Wheeler holds its board meetings at its principal place of business.   Further supporting Virginia courts' recognition of the importance of the internal affairs doctrine, in Taylor v. Mutual Reserve Fund Life Asso., the Virginia Supreme Court observed that "[i]t seems to be well settled that courts will not interfere with the management of the internal affairs of a foreign corporation. Such questions are to be settled by the tribunals of the State which created the corporation."   97 Va. 60, 67, 33 S.E.2d 385, 388 (1899).

Turning to secondary sources and treatises for additional guidance, the Restatement of Conflict of Laws counsels that when answering a choice-of-law question, reviewing courts should consider the "certainty, predictability, and uniformity of result." Restatement (Second) of Conflict of Law § 6 (1971); 1 Moore's Manual — Federal Practice and Procedure § 3.61 (2024) ("[T]he Restatement (Second) of Conflicts . . . is an authoritative source of guidance for the federal courts . . . [and] [i]n any determination, the court considers . . . [t]he certainty, predictability, and uniformity of result."); 1 Connecticut Contract Litigation § 1.03 (2024) (recognizing that generally applicable choice of law principles include "certainty, predictability, and

uniformity of result"); 3 Florida Torts § 100.02 (2024) (same).[23]
Considering such guidance here, there are strong prudential reasons
supporting the uniform application of one state's law to the two
closely related claims.   Otherwise, applying Maryland law to
Plaintiff's breach of fiduciary duty claim and Virginia law to the
claim that another defendant aided and abetted that same breach
could produce "mismatched results . . . which would make it
difficult for parties to anticipate what actions are tortious in
any given situation." In re AGNC Inv. Corp., No. CV-16-3215, 2018
WL 3239476, at *11 (D. Md. July 3, 2018).   This is especially true
when the viability of one legal claim turns on the validity of
another legal claim, as here. See Zucker, 2022 WL 1720151, at *12.

Finally, the Court observes that myriad federal courts across
jurisdictions have elected to apply the law of the state of
incorporation to claims alleging aiding and abetting a breach of
fiduciary duty, but also recognizes that such decisions are not

---

[23] The Fund Defendants claim that the Virginia Supreme Court "rejected" the
factors outlined in the Restatement (Second) of Conflicts of Laws in McMillan
v. McMillan, 253 S.E.2d 662, 663-64, 219 Va. 1127, 1130-31 (1979). But the
Fund Defendants have overstated McMillan's holding.   There, the Virginia
Supreme Court reaffirmed that "the settled rule in Virginia is that the
substantive rights of the parties in a multistate tort action are governed
by the law of the place of the wrong." Id.   In that context, McMillan
rejected the Restatement's so-called "most significant relationship" test
because   Virginia's   existing   rule   better   promoted   "uniformity,
predictability, and ease of application." Id. Accordingly, McMillan did
not   reject   the   Restatement's   general   guidance   that   certainty,
predictability, and uniformity of result are helpful considerations for a
reviewing court addressing a choice-of-law issue.   Nor did McMillan address
Virginia choice-of-law principles in the context of the corporate internal
affairs doctrine, which obtains here and presents different legal
considerations from the car crash-based negligence action at issue in
McMillan.

controlling when analyzing Virginia law.  See In re Am. Ambulette & Ambulance Serv., Inc., 560 B.R. 256, 263 (Bankr. E.D.N.C. 2016) (finding that North Carolina courts had not determined the conflict of law issue and concluding that, based on North Carolina law's application of the internal affairs doctrine, the claims for aiding and abetting a breach of fiduciary duty were properly considered under the law of the state of incorporation); In re AGNC, 2018 WL 3239476, at *11; In re Fedders N. Am., Inc., 405 B.R. 527, 543 (Bankr. D. Del. 2009) ("As with the breach of fiduciary duty claims, the internal affairs doctrine compels the Court to apply Delaware law to the claim for aiding and abetting breach of fiduciary duty."); Mukamal v. Bakes, 378 F. App'x 890, 896–97, 902 (11th Cir. 2010) (same); City of Harper Woods Employees' Ret. Sys. v. Olver, 589 F.3d 1292, 1294–95 (D.C. Cir. 2009) (same); Abrams v. McGuireWoods LLP, 518 B.R. 491, 499 (N.D. Ind. 2014) (same).[24]

Mindful of this doctrinal background, and in view of the Virginia Supreme Court's articulation of corporate law in Taylor and the guidance provided by the foregoing secondary sources, the

---

[24] Reviewing courts have also applied the internal affairs doctrine to claims for aiding and abetting breach of fiduciary duty when the defendants are "bound up" in the corporation's internal affairs as corporate insiders.  See, e.g., Worley Claims Servs., LLC v. Jefferies, 429 F. Supp. 3d 146, 159-60 (W.D.N.C. 2019).  Such considerations would counsel in favor of the application of the internal affairs doctrine (and thus Maryland law) to the aiding and abetting claims here, where the Fund Defendants are alleged to have been significantly bound up in Wheeler's internal affairs through their proxy contest to influence Wheeler's Board, their eventual accumulation of a sizable ownership stake in Wheeler, and the fact that the Stilwell Funds are supposedly controlled by their namesake Stilwell, an influential corporate insider sitting on Wheeler's Board.  Id.

Court concludes that the greater weight of authority suggests that the internal affairs doctrine applies to Plaintiff's aiding and abetting claim, and therefore determines that Maryland law is applicable to Count II.[25]

### b. Viability of Count II under Maryland Law

Next, the Fund Defendants argue that if Maryland law applies to Count II, Plaintiff has still failed to state a claim upon which relief can be granted. ECF No. 27, at 30. Considering this contention, to assert an aiding and abetting claim under Maryland law, a plaintiff must allege "(1) independent tortious conduct by the principal of the tort; (2) assistance, aid or encouragement to the principal of the tort; and (3) knowledge that the tortious act would be the natural consequence of their conduct." Zucker, 2022 WL 1720151, at *12; Natarajan v. Raju, No. 16-1196, 2017 WL 386540, at *2 (D. Md. Jan. 27, 2017); see also Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc., 340 Md. 176, 199, 665 A.2d 1038, 1049 (1995) (recognizing aider and abettor tort liability).

---

[25] Even if Virginia law applied to Plaintiff's aiding and abetting claim, Virginia law remains unsettled as to whether aiding and abetting a breach of fiduciary duty may be pled as a separate cause of action. Keil v. Seth Corp., No. 3:21cv153, 2021 WL 5088242, at *12 (E.D. Va. Nov. 2, 2021) ("[T]he Supreme Court of Virginia has neither expressly recognized nor expressly rejected aiding and abetting a breach of fiduciary action as a separate cause of action. Instead, it has assumed the existence of the cause of action to evaluate whether a plaintiff had properly pled a claim."). The Fund Defendants thus overstate Virginia law to the extent they insist that Plaintiff's aiding and abetting claim would necessarily fail under Virginia law as non-cognizable.

Applying these elements here, Plaintiff's Complaint satisfies the first element of an aiding and abetting claim, alleging breach of fiduciary duty against the Individual Defendants. Plaintiff has alleged that the Individual Defendants, as the principals of the tort, breached their fiduciary duties as Wheeler directors by failing to make any genuine offers to repurchase outstanding shares of D Stock, investing at least $7 million in one of the Stilwell Fund Defendants, and paying interest to Noteholders in D Stock shares. ECF No. 1, at 38.

Considering the second element, whether Plaintiff has adequately alleged that the Fund Defendants assisted, aided or encouraged the Individual Defendants' purported breaches of their fiduciary duties, Plaintiff alleges that the Fund Defendants purchased "nearly $25 million" worth of the Notes issued (close to 90 percent of the available Notes). ECF No. 1, at 15. Plaintiff has also alleged that one of the Fund Defendants received "at least $7 million in cash" through the previously described investment by Wheeler's Board. Id. at 38. Finally, Plaintiff has alleged that the Fund Defendants received discounted D Stock shares as interest payments on the Notes, and that Stilwell ultimately was able to increase his ownership and control over Wheeler (thereby severely diluting Plaintiff's ownership stake) through the Fund Defendants' purchases of Notes. Id. at 39. These allegations are sufficient at the pleading stage to satisfy the second element of aiding and

abetting liability — taken as true, such allegations demonstrate that the Fund Defendants assisted and aided Stilwell's alleged breach of fiduciary duties by acquiring Notes (among other transactions) to expand Stilwell's ownership in Wheeler while diluting the value of the Company's common stock.

Turning to the third element required to state an aiding and abetting claim, Plaintiff must sufficiently plead that the Fund Defendants had "knowledge that [the Individual Defendants'] tortious act[s] would be the natural consequence of their conduct." Zucker, 2022 WL 1720151, at *12. The Fund Defendants contend that Plaintiff has not adequately alleged that they had any involvement in Wheeler's decision to issue interest payments in D stock. ECF No. 27, at 33-34. However, confounding the Fund Defendants' position, Plaintiff alleges that "Defendant Stilwell's knowledge should be imputed to the Stilwell Fund Defendants, which he owned, controlled, and used to carry out his breaches of fiduciary duty." ECF No. 1, at 39.

In light of this imputation dispute, and in the absence of directly applicable Maryland law, the Court has reviewed Delaware case law analyzing this third "knowledge" element of an aiding and abetting claim given the "significant respect" Maryland courts accord to Delaware decisions on corporate law. See, e.g., Shenker, 983 A.2d at 420; Werbowsky, 766 A.2d at 143; Jolly Roger Fund LP v. Sizeler Prop. Invs., Inc., No. Civ. 05-841, 2005 WL 2989343, at

*3 (D. Md. Nov. 3, 2005) ("With respect to corporate governance issues, Maryland courts often look to Delaware caselaw. Accordingly, this Court's analysis must be guided by Maryland law, but will make reference to Delaware law in the absence of applicable Maryland law.").[26]  To that end, in In re PLX Tech. Inc. S'holders Litig., the Delaware Court of Chancery analyzed the third element of a Delaware claim for aiding and abetting a breach of fiduciary duty — knowing participation in the underlying breach.  No. cv 9880, 2018 WL 5018535, at *49-50 (Del. Ch. Oct. 16, 2018).  In so doing, the court observed that "[w]hen the fiduciary and primary wrongdoer is also a representative of the secondary actor who either controls the actor or who occupies a sufficiently high position that his knowledge is imputed to the secondary actor, then the test is easier to satisfy."  Id.  The PLX Tech. court then

---

[26] The Fund Defendants only cite Adobe Systems Incorporated v. Gardiner for the proposition that, under Maryland law, Stilwell's actions are not imputable to the Fund Defendants.  300 F. Supp. 3d 718, 728 (D. Md. 2018). In Adobe Systems, the court held that the plaintiff failed to state a claim for aiding and abetting a breach of fiduciary duty against a corporate entity solely owned by the individual defendant.  In so holding, the court reasoned that the complaint failed to provide a clear link between the corporate entity's actions and the individual defendant's alleged breach, as the corporate entity was only alleged to have provided loans to another corporate entity supposedly involved in the breach.  Id.  In contrast, here, the Stilwell Fund Defendants are alleged to have been intimately involved in Stilwell's alleged breach of fiduciary duty, reportedly purchasing over $25 million worth of Wheeler Notes on Stilwell's behalf in addition to receiving a multi-million-dollar investment from Wheeler.  Moreover, Adobe Systems did not address Maryland law regarding the imputation of knowledge and does not provide any reasoning related to such issue.  Id.  Accordingly, the Fund Defendants' citation to Adobe Systems, without more, does not carry their burden to justify the dismissal of Count II, and the Court looks to well-developed Delaware law on imputation of knowledge to determine if Plaintiff's aiding and abetting claim may survive the Fund Defendants' challenge.

provided examples of appropriate imputation of knowledge, noting that where a controlling stockholder uses acquisition entities to influence a merger, the controlling stockholder's knowledge is imputed to those entities for purposes of aiding and abetting liability.   Id. (citing In re Emerging Commc'ns, Inc. Sholders Litig., No. Civ. A. 16415, 2004 WL 1305745, at *38 (Del. Ch. May 3, 2004)).

Moreover, the Delaware Court of Chancery employed similar reasoning to recognize that "an investment fund can be liable for aiding and abetting when the same individuals who have made the Fund's investment decisions are also the fiduciaries who engaged in misconduct."   Id. (internal quotation marks omitted) (citing Forsythe v. ESC Fund Mgmt. Co., No. 1091, 2007 WL 2982247, at *13 (Del. Ch. Oct. 9, 2007)).

Applying this persuasive reasoning here, Stilwell is alleged to own and control the Stilwell Fund Defendants, and to have used at least one of the Fund Defendants to purchase millions of dollars' worth of Notes to increase his control over Wheeler, to say nothing of the $7 million dollar investment that one of the Fund Defendants allegedly received from Wheeler.   Drawing all reasonable factual inferences in Plaintiff's favor as the Court must at the pleading stage, Stilwell plausibly controls the Stilwell Fund Defendants, and like the entities in Emerging Commc'ns, Stilwell used the funds to execute his corporate objectives, allegedly breaching his

fiduciary duties in the process. Emerging Commc'ns, 2004 WL 1305745, at *38. Additionally, like the investment fund at issue in Forsythe, Stilwell is alleged to have made the Fund Defendants' investment decisions. Therefore, Stilwell's knowledge may plausibly be imputed to the Stilwell Fund Defendants, and thus Plaintiff has sufficiently stated that the Fund Defendants had knowledge that their purchases of Notes, receipt of D Stock shares, and acceptance of an investment by Wheeler would effectuate the Individual Defendants' breach of fiduciary duty. As a result, the Court finds that the Stilwell Fund Defendants have not carried their burden to demonstrate that dismissal is warranted and therefore denies their motion to dismiss the direct claims advanced in Count II.

### 2. Unjust Enrichment, Count III, as alleged against the Stilwell Fund Defendants

The Stilwell Fund Defendants also seek dismissal of Count III as alleged against them. For the same reasons supporting the Rule 23.1-based dismissal of Plaintiff's derivative claims against the Individual Defendants, the Court grants the Fund Defendants' motion to dismiss Count III to the extent it advances a derivative claim. Below, the Court reviews the direct unjust enrichment claim alleged against the Stilwell Fund Defendants.

Given the common factual predicate for Plaintiff's unjust enrichment claim as alleged against both the Individual Defendants and the Fund Defendants, the Court reincorporates its earlier

analysis and similarly finds that Plaintiff has not stated a direct claim for unjust enrichment against the Fund Defendants. Indeed, Plaintiff has not alleged that he personally (or the putative class) conferred a benefit on the Fund Defendants, the first element required to state a direct claim for unjust enrichment. The benefits that the Stilwell Fund Defendants are said to have received — discounted shares of D Stock as interest payment on the Notes, a discounted common stock conversion price for the Notes, and the investment from Wheeler — cannot plausibly be understood as conferred by Plaintiff or the putative class. See Integrated Direct Mktg., 129 F. Supp. 3d at 374; Power Home Solar, LLC v. Sigora Solar, LLC, No. 3:20cv42, 2021 WL 3856459, at *14 (W.D. Va. Aug. 30, 2021) (dismissing unjust enrichment claim because the plaintiff "never allege[d] that it intentionally conferred a benefit on Defendants"); Arkansas Nursing Home Acquisition, LLC v. CFG Cmty. Bank, 460 F. Supp. 3d 621, 649 (D. Md. 2020) (granting dismissal because "the Complaint does not allege that [the plaintiff] conferred a benefit to anyone"); see also Steinmetz v. Immy, Inc., No. 20-185307, 2021 Mich. Cir. LEXIS 1030, at *19-20 (2021) (dismissing claim that the defendants "were unjustly enriched at the expense of [the plaintiff] and other shareholders" through a stock dilution scheme because the complaint failed to allege that the plaintiff directly conferred a benefit on the defendants).

Moreover, while Plaintiff may have plausibly alleged that one Fund Defendant received a benefit through the investment from Wheeler, Plaintiff has failed to allege that the purported benefit rightfully belonged to Plaintiff or the putative class.   See Arkansas Nursing Home Acquisition, 460 F. Supp. 3d at 649 (dismissing unjust enrichment claim in part because the benefit conferred on the defendant — corporate assets — did not belong to the plaintiff and thus the plaintiff had no claim to the benefit). As a result, Plaintiff has not stated a direct claim for unjust enrichment against the Stilwell Fund Defendants, and the Fund Defendants' motion to dismiss Count III is thus granted as to Plaintiff's direct claim alleged against them.   Because Plaintiff has failed to state a direct claim for unjust enrichment against both the Individual Defendants and the Stilwell Fund Defendants, and Plaintiff's unjust enrichment claim as alleged derivatively fails as to all Defendants, Count III is dismissed in its entirety.

## IV. Conclusion

For the reasons explained above, the Individual Defendants' Motion to Dismiss is **GRANTED in part and DENIED in part**, ECF Nos. 23 & 24, and the Stilwell Fund Defendants' Motion to Dismiss is **GRANTED in part and DENIED in part**.   ECF No. 26.   Accordingly, the Court **DISMISSES** the derivative claims alleged in Counts I and II

with **prejudice**, and **DISMISSES** Count III in its entirety **with prejudice**.

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED**.

/s/ ~~~~~
_____
Mark S. Davis
CHIEF UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
September 13 , 2024